**Victor J. ORENA, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Pasquale AMATO, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

Nos. 96 CV 1474, 92 CR 351 and 96 CV 1461.

United States District Court, E.D. New York.

March 10, 1997.

Zachary Carter, United States Attorney by Andrew Weissman, Valerie Caproni, George Stamboulidis, Brooklyn, NY, for the Government.

Gerald L. Shargel, Alan S. Futerfas, New York City, for Defendant Victor J. Orena.

Benjamin Brafman, New York City, for Defendant Pasquale Amato.

## JUDGMENT, MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge:

I INTRODUCTION .................................................1076
II FACTS.........................................................1077
 A. Colombo War ..............................................1077
 B. Orena Trial ..............................................1078
 1. Verdict ..............................................1078
 2. Sources of Evidence ..................................1078
 3. Testimony Identifying Orena as Acting Boss............1079
 4. Ocera Murder .........................................1079
 5. Colombo War...........................................1080
 6. Testimony of Special Agent DeVecchio .................1082
 7. Testimony of Special Agent Favo ......................1083
 8. Sentence .............................................1083
 9. Appeal................................................1083
 C. Amato Trial...............................................1083

1. Verdict ........................................................1083
2. Sources of Evidence .........................................1084
3. Ocera Murder ...............................................1084
4. Testimony of Special Agent Favo............................1084
5. Sentence ...................................................1085
6. Appeal.....................................................1085
D. Gregory Scarpa and R. Lindley DeVecchio .......................1085
1. Scarpa's Criminal Activity.................................1085
2. Scarpa: Confidential F.B.I. Informant ....................1086
3. Scarpa–DeVecchio Relationship ............................1086
4. Suspicions of DeVecchio's Misconduct......................1088
5. Post–Trials: DeVecchio–Scarpa Details ...................1089
6. Defendants' Claims of Suppression .......................1090
III LAW..........................................................1090
A. Rule 33.......................................................1090
B. *Brady* Rule .................................................1090
1. Generally .................................................1090
2. Suppression ..............................................1091
3. Materiality ..............................................1091
C. Newly Discovered Evidence Claims ............................1092
IV APPLICATION OF LAW TO FACTS..................................1093
A. Inferences from DeVecchio's Assertion of Privilege .........1093
B. *Brady* Claim ...............................................1095
1. Suppression ..............................................1095
2. Defendants' Materiality Arguments........................1096
a. Ocera Murder .........................................1097
b. War Conspiracy .......................................1098
c. Remaining Charges ....................................1100
3. Suppressed Evidence Not Material ........................1100
a. Defense Theories Not Supported By Suppressed Evidence ..........1100
b. Assessment of Materiality Must Be Time Sensitive .................1104
c. Evidence Not Material for Purposes of Impeachment ...............1106
C. Newly Discovered Evidence Claims ...........................1108
1. Ocera Murder .........................................1108
2. War Conspiracy........................................1109
3. Claims Unrelated to Scarpa–DeVecchio Material .........1110
V CONCLUSION ....................................................1112

---

# I INTRODUCTION

These are disturbing cases. On the facts and the law, a decision for either side might be justified. After extended evidentiary hearings, briefings, argument and introspection, the court concludes that the defendants should be denied new trials.

Defendants were proven by strong evidence to be murderous criminals. The jury found them guilty in separate trials—Orena in 1992 and Amato in 1993. Their offenses were committed while they were conducting the affairs, and later warring over control, of the Colombo organized crime family. Both were sentenced to life in prison and stripped of their worldly goods. The Court of Appeals affirmed. *United States v. Sessa,* 821 F.Supp. 870 (E.D.N.Y.1993), *affirmed sub nom, United States v. Amato,* 15 F.3d 230 (2d. Cir.1994) and *United States v. Orena,* 32 F.3d 704 (2d Cir.1994).

Attempting to transform a troubling cloud of questionable ethics and judgment enveloping an F.B.I. Special Agent into a raging storm of reasonable doubt, petitioner-defendants move for dismissal of their indictments or for new trials pursuant to Rule 33 of the Federal Rules of Criminal Procedure and section 2255 of Title 28 of the United States Code. The claim is that the government violated its disclosure obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), after engaging in and covering up outrageous government misconduct.

Orena and Amato contend that it was not they—the convicted criminals—but ex-F.B.I.

Special Agent, R. Lindley DeVecchio, who conspired with one of the defendants' associates—the murderer Gregory Scarpa—to cause the killing of their partner and loanshark, Thomas Ocera, and to instigate an internecine mafia war. The evidence to prove this bizarre, but not entirely implausible, contention, defendants argue, should have been supplied to defense counsel so that they could rely on the jurors' rationality or befuddlement (they claim either provides a justifiable basis for reasonable doubt) to achieve a verdict of not guilty, or at least disagreement sufficient for a mistrial.

Scarpa has died in prison and can provide no help on the facts. DeVecchio, having been allowed to resign from the F.B.I. without explaining what happened, pleaded his Fifth Amendment privilege. While he remained silent in court at the earlier hearings and throughout his interminably delayed administrative and professional responsibility proceedings, he spoke freely to the media, apparently uninhibited by fear of cross-examination under oath. *See, e.g.,* Frederic Dannen, *The G–Man and the Hit Man,* The New Yorker, Dec. 16, 1996, at 68. Finally, when the court indicated it would draw inferences adverse to the government from DeVecchio's silence, *see infra* section IV(A), he was granted immunity, all documents relevant to his background were revealed, and he was subjected to fierce examination by defense counsel.

Despite the seamy aspects of law enforcement revealed by the record, for the reasons indicated below, defendants' factual assumptions and legal theories are unpersuasive. Their motions should be denied and their petitions dismissed.

## II FACTS

### A. Colombo War

The Colombo Family is one of metropolitan New York's five major organized criminal groups that together constitute our local Mafia. Others are the Bonnano, Gambino, Genovese, and Lucchese Families. For a description of the role and history of these mobs in New York City *see, e.g., United States v. Sessa,* 821 F.Supp. 870, 871–73 (E.D.N.Y.1993), affirmed, *United States v. Orena,* 32 F.3d 704(2d Cir.1994).

With the exception of the Ocera murder, charges in the two instant cases arose primarily out of incidents connected to a deadly struggle for power between two Colombo factions—the Persicos and the Orenas—that began in the autumn of 1991 and lasted through the spring of 1992. The "Colombo War" left ten people dead and another fourteen wounded.

Over the course of this fratricidal bloodletting the F.B.I., with the aid of the New York City Police Department, made 123 arrests of Colombo Family members. By September 1992, twenty-four of the fifty-four arrested were Persicos. All told, by War's end, sixty-one of those arrested were on the Orena side; sixty were on the Persico side, which was one-third the size of its rival faction.

In an effort to slow what was proving to be a particularly bloody struggle, the F.B.I. focused on stopping hit teams before they engaged in shooting. *See United States v. Scopo,* 19 F.3d 777, 779 (2d Cir.1994). As a result, thirty-five of the first thirty-seven arrests were for possession of firearms. Over 100 guns were seized during the course of the fray. Safehouses on both sides were surveilled and searched. Bugs and videotapes were installed in cars and elsewhere to gather evidence. A video-surveillance device and a bug were even installed at the United States prison facility at Lompoc, California to eavesdrop on jailed Colombo Boss Carmine Persico's strategizing. Special Agent DeVecchio, supervisor of an F.B.I. squad charged with investigating and surveilling the Colombos, oversaw and approved many of the F.B.I.'s activities investigating and hindering the warfare.

In spite of the high casualty rate the F.B.I. must be credited with keeping the Colombo War death toll from growing exponentially. Through efforts that often meant sacrificing information and evidence-gathering, the Bureau forestalled a number of planned murders of members of both factions. For example, upon learning from a cooperator on February 27, 1992 that a Persico hit team had targeted defendant Amato, special

agents attempted to arrest Amato in order to pluck him from harm's way. Rather than proceeding in the customary methodical fashion to assure his arrest, agents rushed immediately to his house. Amato was not there; after learning of the arrest warrant, he had fled and remained on the lam until he turned himself in a month later.

Similarly, on March 26, 1992, upon discovering that Persico captain Michael Sessa's hit team had surveilled Orena soldier Louis "Bo Bo" Malpeso and was preparing to assassinate him, the F.B.I. alerted for dispatch to the scene New York City Police Department officers. Sessa's hit men, detecting the police presence, aborted their attack. On another occasion, after having installed a listening device in the car of Persico associate Joseph Ambrosino, the F.B.I. learned of Ambrosino's plan to murder an Orena captain. In order to thwart that scheme, the F.B.I. insisted upon the arrest of Ambrosino and his hit team, and, as a consequence, sacrificed the valuable electronic surveillance source inside Ambrosino's car.

To date, the United States Attorney's Office, with the critical assistance of the F.B.I. and the New York City Police Department has prosecuted seventy-five Colombo Family members. Forty of those prosecuted were Persicos, and the rest Orenas. These figures do not include New York state's prosecutions of Colombo Family members.

A brilliant and dedicated prosecutorial staff clashed with a scintillating group of defense lawyers in a tenacious struggle over many years, involving many of this courts' judges in difficult litigations. In addition to taking many vicious criminals off the streets by incapacitating them in prison, curtailing this urban guerilla strife undoubtedly saved many innocents from stray bullets.

## B. Orena Trial

### 1. Verdict

On December 21, 1992, after a month-long trial, a jury found Orena guilty of violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (d); conspiracy to murder Colombo associate Thomas Ocera, 18 U.S.C. § 1959(a)(5); the murder of Ocera, 18 U.S.C. § 1959(a)(1) and (2); conspiracy to murder opposing members of the Colombo Family, 18 U.S.C. § 1959(a)(5); conspiracy to make extortionate extensions and collections of credit, 18 U.S.C. §§ 892, 894; use and carrying of a firearm in relation to a crime of violence, 18 U.S.C. § 924(c)(1); and unlawful possession of firearms by a convicted felon, 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

### 2. Sources of Evidence

The government provided compelling and voluminous proof of Orena's guilt. Evidence was presented from a broad range of sources. The government called to the stand over a dozen witnesses, seven of whom were Orena's colleagues in organized crime who had decided to cooperate. This latter group included Michael Maffatore, Harry Bonfiglio, Joseph "Joey Brains" Ambrosino, Kenneth Geller and Alan Quattrache—four associates and a soldier in the Colombo Family. Alphonse D'Arco, former Acting Boss of the Lucchese Family, and Salvatore "Sammy The Bull" Gravano, former Underboss of the Gambino family, testified at length. Both had dealt directly with Orena. F.B.I. Special Agent DeVecchio, a supervisor responsible for investigating the Colombo and Bonnano Families, was an expert witness. *See infra* section II(B)(6).

A wiretap from a "roving bug" placed in the car used by Orena and his associates revealed the defendant in all his thuggish traits. The recordings—the "Audino car tapes"—pertained principally to the racketeering and murder charges. Supporting portions of tapes from the Quattrache home and the Ambrosino car were also admitted.

Numerous firearms and other physical evidence—ammunition, beepers, counter-surveillance equipment, large amounts of cash, and illegally-obtained telephone toll records—were introduced. Most of it had been obtained through a series of searches culminating in the April 1, 1992 search of the residence of Orena's girlfriend, where he was staying at the time of his arrest. Much of this physical evidence was introduced during the testimony of F.B.I. Special Agent Chris Favo. *See infra* section II(B)(7).

How the testimony and physical evidence was connected to the principal charges in this case is outlined in the following sections.

### 3. Testimony Identifying Orena as Acting Boss

In May 1988, about two years after Colombo Family Boss Carmine Persico was incarcerated and after a committee appointed to govern in his absence proved unworkable, Persico, from his jail cell, appointed Orena Acting Boss. Testimony of a number of the witnesses confirmed Orena's high-ranking criminal status. Gravano, the Gambino Underboss, was present at the meeting of the Commission—the Mafia leadership circle comprised of representatives of each New York crime family—at which Orena was unanimously approved as the official Acting Boss. D'Arco, the Lucchese Acting Boss, testified that Orena told him that he had the power to "make members or kill guys" unless explicitly instructed otherwise by Persico—authority that only could be vested in a Boss or Acting Boss.

Ambrosino, Bonfiglio, and Quattrache also identified Orena as Acting Boss. Quattrache, a "made member" of the Colombo Family, testified that he was formally inducted in a 1988 ceremony presided over by Orena. Bonfiglio referred to Orena in court as the "boss."

Additionally, the tapes of conversations in the car of Joseph "Chubby" Audino, a close associate of Orena, identified Orena as Acting Boss. For example, one recording established that members of the opposing faction tried to kill Orena rather than ask him to "step down."

### 4. Ocera Murder

A central event in the government case was the 1989 murder of Colombo associate, Tommy Ocera. The government's theory was that Orena, as Acting Boss, directed subordinates to murder Ocera. One of these subordinates was Scarpa, who would, two years later find himself opposed to Orena in the Colombo War. In the early fall of 1989, Ocera and his girlfriend were stalked at Orena's direction. On November 13, 1989 in the Merrick, Long Island home of defendant Amato, Ocera was murdered. Ocera "disappeared" into a shallow grave on Orena's order.

Testimony at Orena's trial established his role in the Ocera killing. Orena had a number of motives to kill Ocera. Gravano testified that one was to please John Gotti, the Gambino Family Boss. Other circumstances bore this out. At the time, it was believed in mob circles that Ocera had murdered Greg Reiter, the son of a close associate of Gotti, and that Gotti had been "ripping mad" at Ocera after Reiter's murder. Gravano was present one day when Orena paid a visit to Gotti at the Gambino Boss' headquarters, the Ravenite Social Club. Gravano had observed that, prior to Orena's arrival, Gotti seemed agitated. After Orena arrived and conversed privately with Gotti, Gotti appeared calmer. Gotti later reported to Gravano that "they whacked that Tommy Ocera."

D'Arco's testimony corroborated Gravano's as to this motive. At a December 1989 dinner for Colombo and Lucchese Family leaders, Orena boasted to D'Arco that he had had Ocera "whacked," as a favor to Gotti because Ocera had killed Reiter.

Another motive may have been to punish Ocera for skimming money from Orena's money lending business. This would communicate to others what would happen to them if they did the same.

Orena's primary motive, however, was to silence Ocera after he put Orena in jeopardy with law enforcement. On October 5, 1989, the Suffolk County police executed a search warrant at the Ocera-operated Manor Restaurant in Merrick, New York. The search resulted in the seizure of Ocera's loansharking records. Orena had been using the Manor on Monday nights as a regular meeting place, and the seized records implicated Orena.

Ocera's girlfriend, Diane Montesano, testified that about four days after the seizure of the loansharking records, Ocera tried unsuccessfully to retrieve them. He had Montesano go to the police station to ask for them. When Montesano failed to bring back all the records, Ocera became despondent. In an effort to blunt his anxiety, Ocera uncharac-

teristically got drunk, rapidly consuming four or five martinis; Montesano had to leave him at her house so that he could sleep it off. Later that day two of Orena's sons paid an unexpected visit to the Manor in search of Ocera. After checking with Ocera, who said it was okay, Montesano brought them to her house to see him.

Later that month, Montesano and Ocera were followed as they left the Manor. As was their custom after closing, Montesano was taking home that night's proceeds and Ocera intended to follow her to make sure she arrived safely. Departing the restaurant, Montesano noticed two cars without license plates parked at the railway station across from the Manor. Ocera watched her enter her car and leave. Later, when Montesano approached her house, one of the cars she had noticed earlier appeared and veered directly at her, head-on. She managed to avoid a collision, and the car disappeared. Montesano was able to make out the profile of one of the drivers, testifying that it might have resembled Gregory Scarpa. The following night, Orena appeared at the Manor and told her that he heard she was a good driver and that she had "done a great job the night before."

A number of weeks later, in mid-November, Ocera was murdered. Testimony directly linked Orena to the crime. Bonfiglio testified that Gioachino "Jack" Leale, a Colombo soldier in Amato's crew, told him that Orena ordered Ocera murdered. Maffatore and Bonfiglio had driven Leale to a meeting with Orena outside of Orena's club in Cedarhurst, New York. Remaining in the car, they observed Leale and Orena go on a "walk-talk"—Mafia parlance for a conversation held while walking outdoors in order to avoid audio-surveillance. When Orena and Leale approached the car, Bonfiglio overheard Orena tell Leale that he wanted "this thing taken care of." At first, Bonfiglio did not understand the reference, but Leale later told Maffatore and Bonfiglio that Orena had given him a contract to "whack" Ocera—i.e., to murder him. Leale's participation in the murder did not go unrewarded. The next day—November 14, 1989—Leale was "given" Ocera's two gambling clubs, in keeping with

mafia practice. After a "made-member" of a family dies, his criminal enterprises revert to the family for redistribution.

Slightly less than two years after the killing, Maffatore agreed to cooperate with the F.B.I. Although he did not participate directly in the murder, he admitted that he and Bonfiglio dug Ocera's grave on the night of November 13, 1989. Using directions provided by Maffatore, F.B.I. agents found and exhumed Ocera's body in Forest Park, Queens. The metal wire described by Orena's underlings as having been used to strangle the loanshark was still around his neck. The method of killing and disappearance of the body so the victim and his mourners would be denied the dignity of a funeral and formal burial (and the widow, life insurance proceeds) was one chosen by Acting Boss Orena. Arrest warrants were issued for Bonfiglio, Leale, and two other participants in the burial. Leale was not apprehended. Four weeks later, he was found dead in a Long Island hotel parking lot.

Maffatore's and Bonfiglio's testimony linking Orena to Ocera's murder was substantially buttressed by other evidence. For example, as already noted, D'Arco testified that at the December 1989 dinner meeting of the Colombo and Lucchese Family leadership, Orena admitted to D'Arco that he had ordered the murder. Orena bragged that "we whacked Tommy Ocera. We gave him a *luparo bianco*," meaning that they made his body disappear.

### 5. Colombo War

As to the counts relating to the Colombo War, the central proposition in the government's theory was that two years after the Ocera murder Orena and his minions initiated and prosecuted an internal struggle within the Colombo Family in order to gain complete control. Orena sought to wrest dominion from the jailed Persico and his son and heir apparent, Alphonse "Allie Boy" Persico.

By 1991, Orena's ambitions prompted a Persico faction attempt on his life. After a five-month truce, Orena broke the tenuous peace by ordering his men to target Scarpa, who at that point was aligned with Persico.

For the next few months Orena and his subordinates engaged in shooting hostilities, collecting munitions, traveling around armed, and tracking down Persico loyalists in order to eliminate them.

Evidence from a number of sources established Orena's extensive role in prosecuting the War between rival factions of the Colombo Family. D'Arco, Ambrosino, and Gravano testified to Orena's ambition to gain greater control of the Family, specifically his aspiration to become official Boss. Through a campaign of publicly disparaging and discrediting his jailed superior, Orena intended to persuade the Commission to remove Persico as Boss. Orena announced that Persico was a "rat" because Persico had violated the prohibition against admitting the existence of the Mafia—the code of *omertà*. He also leveled more specific charges against his Boss. For instance, Orena criticized Persico for having provided information on the mob to a *New York Daily News* journalist and for having discussed with CBS's *60 Minutes* the possibility of appearing on that show. According to Gravano, these accusations were the sort that would lead the Commission to label Persico "no better than an informer"—a fatal black mark in mob circles.

Orena believed Scarpa was in the way of his efforts to become the Boss. D'Arco and Gravano testified that Orena approached them with a request for assistance in murdering Scarpa, who Orena suspected was fiercely loyal to Persico. D'Arco was unwilling to provide such assistance absent the authorization of his own superiors, Lucchese Boss Vic Amuso and Underboss Anthony "Gaspipe" Casso, both of whom were fugitives at the time. Gravano was, on Gotti's instructions, to assist Orena; his crew monitored Scarpa and was prepared to kill him. They never followed through, however, because Orena retracted his request, having decided that having another family eliminate Scarpa would not look good for an Acting Boss and might cause too much political strife.

In early 1991 Carmine Persico announced that "Allie Boy," upon his anticipated release from prison in June 1993, would become Boss of the Colombos. The announcement raised tensions between Family members loyal to Orena and those loyal to Persico. Strains escalated after Orena suggested that Colombo Consigliere Carmine Sessa disparage Carmine Persico to Colombo captains. Specifically, Orena cajoled Sessa to label the elder Persico a "rat" who should be "knocked down." Sessa demurred, instead reporting Orena's slur to Allie Boy's brother and Colombo captain, Teddy Persico. Upon learning of Sessa's disobedience, Orena planned to have Sessa killed at a "making" ceremony for new Mafia members.

Sessa caught wind of Orena's plan and attempted to strike first. He and three others waited in a car outside Orena's home on the night of June 20, 1991 with the intention of killing him. Orena, however, spotted them and was able to escape unharmed. Other Persico loyalists, after failing to kill a captain aligned with Orena that same night, fearing retaliation, retreated to a New Jersey hotel.

Ambrosino, D'Arco and Gravano testified that efforts were initiated by the other crime families to prevent these incidents from igniting a full-scale shooting conflagration. The Gambino, Lucchese and Genovese Families established a special committee to communicate with, and mediate between, the two Colombo factions. This Alternative Dispute Resolution strategy proved only partly successful in postponing hostilities even though it continued throughout the summer of 1991. Orena was present at all the ADR meetings, but Sessa refused to return after attending the initial one. Both the Luccheses and Gambinos supported Orena, and according to D'Arco, the committee's efforts to keep the peace were directed primarily at Orena, since he controlled a majority of the Colombo soldiers and seemed eager to open hostilities.

The detente ended on November 18, 1991. A crew led by William "Wild Bill" Cutolo, a captain allied with Orena, fired shots at Scarpa.

Overall, the government's evidence regarding the conduct of the War, and Orena's engineering of it, derived from three principal sources: (1) the testimony of Quattrache and Ambrosino; (2) the Audino car tapes; and (3) searches of various locations, includ-

ing Orena's girlfriend's residence on April 1, 1992, the day of his arrest.

Ambrosino and Quattrache testified about the Persico faction's efforts to kill Orena and his supporters. Activities included the formation of "hit teams" and urgent attempts to locate Orena faction members. For example, in an effort to kill defendant Amato, Ambrosino and some others surveilled Amato's house and his wife for six weeks.

The taped conversations from "Chubby" Audino's car—intercepted between February 6, 1992 and March 1, 1992—revealed many of the Orena faction's activities during the fray. Orena and his associates carried guns, frequently switched cars to avoid surveillance, and voiced concerns about being tracked by Persico factionalists. Orena would arrange meetings and determine whether associates should come "loaded" with a weapon. The tapes showed not only that the Orena crews were actively trying to kill Persico faction members, but which ones were deeply involved in that endeavor. In a February 26, 1992 conversation, "Chubby" Audino identified three Orena murder-crews by reference to their captains: defendant Amato, Vic Orena, Jr. and "Wild Bill" Cutolo.

The April 1, 1992 search of Orena's girlfriend's residence in Valley Stream, New York uncovered a plethora of incriminating evidence. When agents entered, Orena was in the basement with his sons, Vic, Jr. and John. Agents found an arsenal. There were fully loaded shotguns in each of the three basement closets. Extra ammunition was stored with the shotguns, including hollow-point bullets, shotgun shells, and a 16–round, 9 millimeter clip. On the main floor of the house agents found a fully-loaded pistol-grip shotgun and an ammunition belt holding numerous shotgun shells. In the crawl-space under the backyard wooden deck, they retrieved a black plastic garbage bag containing six loaded operable handguns and two extra clips.

Aside from the weaponry, the search uncovered a bullet-proof vest and three sets of mobile phones and beepers. Orena's briefcase was found in the second floor bathroom. It contained $55,000 in cash. Also seized were corruptly-obtained telephone toll records—the sort that may be lawfully obtained only by subpoena—and Coles directories, used to find the address to which a particular telephone number is assigned. Handwritten documents in the basement revealed that someone had already made lists of addresses, using the telephone numbers from the toll records, including those for the homes of Joseph Russo and Doris Schmelling, a friend of Teddy Persico. Russo and Teddy Persico were Persico faction captains who, according to Ambrosino, Orena had ordered killed. The records from Orena's basement revealed an effort to track them down through their telephones.

### 6. Testimony of Special Agent DeVecchio

DeVecchio, at the time a twenty-five year veteran of the F.B.I., took the stand as the government's expert on organized crime. His testimony was in two parts. First, he provided a general overview of organized crime activity and F.B.I. investigations, briefly covering the rules, structure and terminology common to organized crime and a description of F.B.I. surveillance techniques. Second, he testified as to his knowledge regarding those who died during the Colombo Family War.

Specifically, DeVecchio described the general structure of the New York organized crime families, explaining their relation to each other and their internal hierarchies. Included were descriptions of the roles of the Boss, Underboss, Consigliere, captains, soldiers and associates. DeVecchio testified that the Boss sets family policy, sanctions murders, settles disputes, and generally is knowledgeable about all the family's activities. He explained that it is not uncommon for families to install an individual in an "acting" position, and that he could recall a number of times when families operated under the charge of an Acting Boss. DeVecchio also discussed ways in which the families generate money: through extortion, loansharking, infiltration of legitimate unions and businesses, and gambling.

In the second portion of his testimony DeVecchio briefly discussed a fratricidal war

in the early 1960's, and then proceeded to describe the Colombo War by summarizing the official reports of other F.B.I. Special Agents. He noted that ten individuals had been killed and fourteen had been injured. The first recorded incident was the botched November 18 shooting at Scarpa. He catalogued what the reports showed of other incidents that followed soon thereafter, listing a number of individuals who were shot and the dates on which they were shot. All of the shootings occurred between November 18, 1991 and June 4, 1992.

DeVecchio's testimony was general and historical in nature. It was "boilerplate," based on well known information and records of law enforcement agencies. It could have been supplied by a considerable number of F.B.I. agents or New York City Police Department officers who had worked in anti-mafia task forces over many years.

The court instructed the jury that it should not conclude from DeVecchio's testimony that the defendant was a member of any of the organized crime families described or that he committed any of the acts described. The purpose of the testimony was to create a context in which the jury could better understand the specific evidence that it was to receive during the trial.

On cross-examination, defense counsel offered no impeachment of DeVecchio regarding his truthfulness, bias or motive to obtain a conviction against Orena.

### 7. Testimony of Special Agent Favo

Special Agent Favo's testimony pertained to the particulars of the investigation. He explained that as a Special Agent assigned to the Colombo Family he supervised cooperating witness Maffatore and had made a surreptitious recording of Maffatore's October 1, 1991 conversation with Bonfiglio. He explained how the F.B.I. then proceeded to arrest Bonfiglio and to issue arrest warrants for three others, including Leale, in connection with the Ocera homicide. Favo also described the various searches and arrests of individuals allegedly associated with Orena. During his testimony, the government introduced evidence—mostly guns—retrieved from the searches.

### 8. Sentence

Orena was sentenced in the spring of 1993. *United States v. Sessa,* 821 F.Supp. 870 (E.D.N.Y.1993). He received concurrent sentences of life in prison for racketeering, life for racketeering conspiracy, life for the underlying murder, ten years twice for murder conspiracy, twenty years twice for loan-sharking, and ten years for illegal possession of a firearm. Orena was also sentenced to an additional five years for use of a firearm in connection with a crime of violence. Also imposed were fines totaling $2,250,000 and a special assessment of $450. Orena was ordered to pay the cost of his imprisonment.

### 9. Appeal

On appeal, Orena raised a number of challenges to his conviction and sentence, none of which are related to the present motion. He presented eleven arguments for reversal, ranging from a challenge to the RICO convictions based on insufficiency of evidence, to a claim of improper admission of evidence pertaining to the loansharking charges, and to the propriety of the fines and payments ordered at sentencing. Orena also appealed the court's denial of a earlier motion for a new trial which was based on alleged perjury on the part of Gravano and alleged prosecutorial misconduct in connection with Gravano's testimony and that of Montesano. The court of appeals addressed each issue and affirmed the conviction and the order denying the motion for new trial. *United States v. Orena,* 32 F.3d 704 (2d Cir.1994).

### C. Amato Trial

### 1. Verdict

On January 25, 1993, Amato was found guilty by a jury of substantive and conspiracy violations of RICO, 18 U.S.C. § 1962(c), (d); conspiracy to murder Ocera, 18 U.S.C. § 1959(a)(5); the murder of Ocera, 18 U.S.C. § 1959(a)(1) and (2); conspiracy to make extortionate extensions and collections of credit, 18 U.S.C. §§ 892, 894; and unlawful possession of firearms by a convicted felon, 18 U.S.C. § 922(g)(1).

## 2. Sources of Evidence

The bulk of evidence of Amato's guilt came from two sources: testimony of the cooperating witnesses—Maffatore, Bonfiglio, Ambrosino, who was a former member of Amato's crew, and D'Arco; and court-authorized and consensual tape recordings. The cooperating witnesses testified to the existence of the Colombo Family and to Amato's position in it. Amato had risen in the Colombo ranks to captain in 1987 and was at one time promoted by Orena to Acting Underboss, only to be later reduced in rank to captain. Ambrosino and Amato had known each other for years as members of the same crew.

Physical evidence—e.g., a diary and a .38 pistol—seized by law enforcement was introduced to support the loansharking and weapons charges respectively. Although Amato was not charged with participation in the Colombo War, the government introduced evidence of the War to support the charges against him. The evidence was admissible to prove relationships and background to, *inter alia,* the murder conspiracy charge.

## 3. Ocera Murder

Evidence established that Amato knew and associated with Ocera as a fellow criminal. He and Leale met regularly with Ocera mornings at the Manor before it opened. Photographs showed Amato, Leale and Ocera together at various Colombo Family wakes. The materials that were seized by the Suffolk County police contained numerous references to "Patty [Amato]" and "Pat A." next to dollar figures.

Ocera feared that he was in trouble after the Suffolk County police seized his loansharking records implicating Orena and Amato. *See supra* Section II(A)(4). Soon after Montesano's failed attempt to retrieve the seized materials, Ocera conveyed to her his fears of being killed. He told her where he wanted to be buried should something happen to him. Similarly, according to Maffatore, Ocera had informed Leale that if he were killed, he hoped that his body would be found so that his wife could collect the insurance. During this period Ocera received two anonymous phone calls, one informing him that he was "dead," the other instructing him to run.

Maffatore and Bonfiglio linked Amato to the Ocera murder. After Leale "received a contract to whack" Ocera from Orena, Leale instructed Maffatore to drive to a gambling club in Merrick. Bonfiglio went with Maffatore, and when they got to the club, Leale met with Amato for approximately fifteen minutes. Maffatore and Bonfiglio were standing nearby, and were not included in the conversation. As already noted, however, Maffatore overheard Amato tell Leale that he did not want the body found.

Ocera was scheduled to be present at a 10:30 a.m. meeting at the Manor on Monday, November 13, 1989. He left home early that morning, but never arrived at the restaurant because he stopped at Amato's house in Merrick. There, he was thrown to the ground by Amato, and strangled with a metal wire by Leale. Ocera's body was then dumped into the trunk of Bonfiglio's car, which Leale had borrowed. That night, Bonfiglio, Maffatore, Leale and two others buried the body in Forest Park, Queens. Bonfiglio testified that he did not know at the time that Leale had killed Ocera; a few weeks later, Leale told him that "Patty" held down Ocera while Leale garroted him. Thereafter, Amato—contrary to his previous practice—never came to the Manor or called the restaurant again.

After Maffatore agreed to cooperate with the F.B.I. two years later, he surreptitiously taped a conversation with Bonfiglio. Implicating Amato in the murder, Bonfiglio expressed annoyance that he never received "credit" from Amato for his role in disposing of Ocera's body.

## 4. Testimony of Special Agent Favo

Special Agent Favo served as the F.B.I. case agent for the prosecution of Amato. He sat at the government table throughout the trial, and was the first witness to be called. Favo first testified about his supervision of Maffatore. He explained the logistical details of arranging the taping of Maffatore's inculpating October 1, 1991 conversation with Bonfiglio and described how Maffatore showed agents where Ocera was buried and

how Bonfiglio decided to cooperate after he was found guilty for his role in Ocera's murder. The government introduced the tapes and photographs of Ocera's burial spot during this testimony.

On cross examination, Favo explained that he did not initiate contact with Maffatore, but that Maffatore was referred to him by F.B.I. Special Agent Gandolfo. Gandolfo had in the past received information from Maffatore on other matters; he had referred Maffatore to Favo when he learned that Favo was working on the Ocera homicide.

Favo was called to the witness stand a second time, and testified that he conducted searches and seized records and weapons in relation to the F.B.I. investigation of the Colombo Family. He described the January 31, 1992 search of Amato's residence, during which he found a Davis .380 automatic pistol and a loaded magazine clip in the detached garage.

### 5. Sentence

Amato was sentenced concurrently to life in prison for racketeering, life for racketeering conspiracy, life for the underlying murders, ten years for murder conspiracy, twenty years twice for loansharking, and ten years for illegal possession of firearms. Fines totaling $1,750,000 and a special assessment of $350 were imposed. Amato was ordered to pay the cost of his imprisonment. *United States v. Sessa,* 821 F.Supp. 870 (E.D.N.Y.1993).

### 6. Appeal

On appeal Amato's principal challenges were directed toward the sufficiency of the loansharking evidence, evidentiary rulings regarding the loansharking counts, and the sentence which he claimed was not individualized. The court of appeals affirmed. *United States v. Amato,* 15 F.3d 230 (2d. Cir. 1994). Nothing in his appeal relates to the present motion.

### D. Gregory Scarpa and R. Lindley De-Vecchio

### 1. Scarpa's Criminal Activity

Gregory Scarpa Sr. was a life-long associate of organized crime. He engaged heavily in criminal activity from the 1970's onward, cultivating strong criminal relationships with various members of the Colombo Family, including Carmine Sessa and Lawrence Mazza, who would remain closely tied to him during the period of the Colombo War. His criminal specialties over the years included credit card fraud, extortion, narcotics trafficking, and homicide. It is alleged that he had murdered at least eight people before the War commenced, and as a result of his penchant for killing, had earned from his associates the sobriquets the Grim Reaper, the Mad Hatter, and General Schwarzkopf.

In 1986, Scarpa was the subject of a federal indictment charging possession and trafficking in false credit cards. He had signed a plea agreement which could have resulted in up to seven and a half years of imprisonment and a $250,000.00 fine, but was sentenced only to probation and a $10,000 fine.

Scarpa operated a criminal enterprise with departments specializing in gambling, narcotics, and loansharking from his club, the Wimpy Boys Social Club. In 1987, ten federal indictments resulting from a Drug Enforcement Agency investigation were handed down in relation to Wimpy Boys activity. Scarpa was not among those indicted. His charmed life vis-a-vis law enforcement may be attributed to the fact that he was a long time informer for the F.B.I. *See infra* section II(D)(2).

Scarpa's criminal endeavors did not cease after the commencement of the Colombo War. Although there was no violence for the five months after Sessa targeted Orena, Scarpa did not believe the peace would last. He warned, in reports to the F.B.I. in early 1991 that violence was about to explode. On November 18, 1991, Scarpa reported that he had been the subject of an attempted "hit" by the Orena faction.

Claiming to act in retaliation for the shooting, Scarpa launched a violent campaign against the Orenas. He was a prolific killer, perhaps the most violent combatant in the War, apparently having killed four and wounded two. In early December he participated in the murder of Vincent Fusaro. In

early January of the next year he helped murder Nicky "Black" Grancio. In late May 1992 he assisted in the murder of Larry Lampesi.

Over the course of the War Scarpa conspired to murder others. On Thanksgiving Day, 1991, Scarpa planned to kill "Wild Bill" Cutolo by disguising himself as an Hasidic Jew and ambushing the unwitting Cutolo as he left his girlfriend's house. The plan was called off when a *New York Post* article that very day mentioned that Scarpa might be an informant. In February 1992 Scarpa wounded Joe Waverly, shooting him in the stomach following a point-blank shoot-out.

Ambrosino was arrested in early June 1992 and agreed to cooperate with the F.B.I. He provided information that implicated Scarpa in the murders of Fusaro, Grancio and Lucchese Family member Gaetano Amato. Scarpa was not indicted even though two of his henchmen, Mazza and Delmasto, were.

Scarpa was arrested by the New York City Police Department on August 31, 1992 on a firearms charge. Shortly thereafter, a federal indictment charging Scarpa with the commission of the three murders, among other crimes, was handed down.

Scarpa was released on bail under strict house confinement as one of the conditions of release because of his health. He was suffering from full-blown AIDS. In late December 1992, his bail was revoked because of his involvement in a shooting.

Scarpa was sentenced to ten years in prison in December 1993 after pleading guilty to two counts, one of which involved the murder of Fusaro. He died of AIDS in federal prison in Minnesota in June of 1994.

### 2. Scarpa: Confidential F.B.I. Informant

Scarpa was a long-time and active confidential informant to the F.B.I. F.B.I. briefing synopses—Form "209's"—indicate that he began providing the Bureau with information in 1980. Earlier the F.B.I. reportedly had enlisted Scarpa to help break the silence of the Mississippi Ku Klux Klan in relation to the disappearance of three civil rights workers. Scarpa is said in unconfirmed rumor to have acquired information the Bureau desired after kidnaping a Klansman and intimidating him with a gun supplied by the F.B.I.

Classified as "Top Echelon," Scarpa was a valuable informant. Prior to the onset of the War, the bulk of the information he passed on pertained to activity within the Colombo Family: who occupied certain positions, who was proposed as a new member, who was working with whom, and who operated what rackets and where. Scarpa's reports increased substantially once the War commenced in late November 1991. From then on Scarpa gave the Bureau detailed reports from the front line of perpetrators and targets of "hits" executed by the opposing factions, various strategies and plans of attack, and failed attempts by other families to call a truce, among other things.

Scarpa was closed as an informant on March 3, 1992 after it was rumored that he was conspiring to murder someone. He was reopened on April 8, 1992.

He received scant attention in defendants' trials. The government argued, based on Montesano's testimony, that Scarpa may have stalked Ocera a few weeks prior to his murder in 1989. Ambrosino testified that Scarpa was suspected of being an informant, referencing the November 28, 1991 *New York Post* article.

### 3. Scarpa–DeVecchio Relationship

In the 1970s and perhaps back to the 1960s Scarpa had been regularly in touch with an F.B.I. agent. The relationship was broken off until DeVecchio succeeded in renewing Scarpa's informer status in December 1980. DeVecchio acted as Scarpa's F.B.I. handler from that time until Scarpa was finally terminated as an informer after the War. Throughout this period, DeVecchio served as Scarpa' lone handler in spite of Bureau protocol that informants be handled by two agents at a time. Those guidelines had been waived on account of Scarpa's distrust of anyone else. It was, however, arranged that in emergencies, Scarpa could be contacted by Favo.

Scarpa was well-paid by the F.B.I. for his information. What is possible, but not self-

evident, is that DeVecchio also "paid" Scarpa by passing along information, creating a two-way street for communication that was dangerous and unauthorized. Did DeVecchio do this? Was he so captivated by Scarpa as to have reversed their roles? Defendants emphatically answer "yes" to both questions.

Over the course of their relationship DeVecchio may well have made a number of unauthorized disclosures of information to Scarpa. In 1986, DeVecchio arguably warned Scarpa of his pending arrest on federal credit card fraud charges, and he may have intervened with the sentencing judge to request lenient treatment of his informant. There is a suspicion that in 1987 he leaked to Scarpa information that the Wimpy Boys Social Club was subject to court-ordered electronic surveillance. Indications were that DeVecchio tipped off Scarpa to the planned D.E.A. arrest of his son, Gregory Jr., and others in connection with the criminal activity at the social club, and that one of the targets of arrest, Cosmo Catanzano, was likely to cooperate with law enforcement. It is argued that as a result, Scarpa ordered that Catanzano be killed and warned his son, who then became a fugitive.

Within the Colombo Family, there was a strong suspicion in the 1980s and 1990s that Scarpa derived protection from a law enforcement source, and it was widely rumored in the 80's that he was an informer. Carmine Sessa, Scarpa's protégé, harbored deep apprehensions. While the credit card case was pending, Scarpa was in the hospital receiving treatment for a stomach ulcer; Sessa's wife, who had come to visit, answered the phone for him and the caller identified himself as a "Mr. Della" or "Mr. Dello." Later, Scarpa's wife told Sessa that Scarpa's "friend" had called to inform him that he would not have to go to jail.

DeVecchio, defendants suggest, continued to pass information to his informant, Scarpa, throughout the Colombo War. In January 1992, DeVecchio was suspected by some of having revealed to Scarpa defendant Orena's hiding place. Around that same time, he was, it is said, believed to have conveyed to Scarpa the address at which Salvatore Miciotta, another Orena factionalist, was residing.

On or about February 27, 1992, DeVecchio, it was inferred by defendants, told Scarpa that one of his men, Carmine Imbriale, was cooperating with authorities.

DeVecchio, say defendants, may even have aided and abetted Scarpa in criminal pursuits. In April 1992, DeVecchio is thought by them to have supplied Scarpa with the addresses of his loanshark victims. DeVecchio had asked Special Agent Favo to obtain subscriber information for a telephone number he had received from Scarpa, and later is said to have told Favo that he was supplying Scarpa with addresses for his "business" customers.

On March 3, 1992, Scarpa was closed as an informant after the Assistant Special Agent in Charge of the Criminal Division of the New York F.B.I. office, Donald North (a superior of DeVecchio's), found credible allegations that Scarpa was involved in planning violent criminal activity. Criminal violence would have disqualified retention of a person on the F.B.I.'s informer rolls. In informal conversations with North, DeVecchio was allegedly "adamant" that Scarpa was not involved in violent activity.

Early in April 1992 DeVecchio initiated the process of having Scarpa "re-opened." The Bureau granted authority to reopen Scarpa on April 8, pending completion of a "suitability inquiry." On April 22, DeVecchio notified Bureau headquarters that such an inquiry had been conducted and that Scarpa was deemed suitable. DeVecchio did not inform North of this action or seek North's authorization for it. North has testified that his authorization was not required to reopen Scarpa.

After Ambrosino's briefing of law enforcement officials in early June 1992, DeVecchio is believed by some to have informed Scarpa that arrest warrants had been issued for his henchmen, Mazza and Delmasto, and that they could avoid arrest by steering clear of their normal haunts. Mazza and Delmasto were not immediately arrested.

On June 25, 1992, the Manhattan District Attorney's Office and New Jersey law enforcement officials executed an arrest warrant and took into custody a number of indi-

viduals. (It was learned later that Scarpa may have been at the arrest location shortly before the arrests were made.) The F.B.I. then rearrested them pursuant to a federal warrant so that they would not be released. When Special Agent Favo advised DeVecchio what had occurred, DeVecchio upbraided him and the other agents present. DeVecchio instructed the agents to "do paperwork" instead of making arrests, and to arrest no one without his specific approval.

Immediately after Scarpa's federal arrest, DeVecchio asked prosecutors to consent to Scarpa's release on bail, reasoning that he was of more value to the F.B.I. on the street than in jail. Scarpa was then released, only to have bail revoked, as already noted, when he became embroiled in a shooting incident.

None of the information about the DeVecchio–Scarpa relationship was presented at defendants' trials. Defendants contend that had they known, the information would have been presented to a jury and that it would have resulted in acquittals.

### 4. Suspicions of DeVecchio's Misconduct

In the summer of 1992, Special Agent Favo had become strongly suspicious of DeVecchio, believing that he was engaged in misconduct. DeVecchio's reaction to news of a rise in the intensity of the War led to Favo's heightened concern. On May 22, 1992 Favo learned that Orena factionalist Larry Lampesi was killed. After Favo told DeVecchio of Lampesi's demise, DeVecchio reportedly excitedly slapped his hand on his desk and exclaimed, "We're going to win this thing." Favo reminded DeVecchio that the F.B.I. was not interested in which faction won. DeVecchio then responded that he meant the F.B.I. would win.

Favo, from that moment on, began, he testified, to withhold from DeVecchio information pertaining to Scarpa, surmising that DeVecchio might have blurred the line between agent and informant, becoming a "cheerleader" for the Persico faction. He believed that DeVecchio might disrupt current investigations.

The fact that Scarpa was not arrested after Ambrosino decided to cooperate in early June 1992 further buttressed Favo's distrust of DeVecchio. For some time, Favo wanted to arrest Scarpa in view of information obtained from the Imbriale and Ambrosino briefings. He believed that Scarpa was not forthcoming as an informer and was of little value to the Bureau. Although the New York F.B.I. anti-mafia squads could not arrest Scarpa due to DeVecchio's prohibition, Favo hoped that the Brooklyn District Attorney's Office would. On August 30, 1992, the New York Police Department informed Favo of its plans to arrest Scarpa. Favo told DeVecchio, and DeVecchio appeared visibly upset according to Favo.

By autumn 1992, after Scarpa had been arrested, Special Agent Leadbetter also began to believe that DeVecchio had attempted to interfere in or stall an investigation of Scarpa. Similarly, Special Agent Tomlinson grew suspicious of DeVecchio after the Ambrosino briefings.

None of DeVecchio's subordinates reported to superiors or to the United States Attorney their concerns about Scarpa's violence or DeVecchio's possible misconduct. Favo was, he testified, concerned that no one would believe him, particularly since DeVecchio was a well-respected veteran of the Bureau. Tomlinson believed that someone else would make a report. The agents held back even though they had good reason to suspect that Scarpa was a murderer, and despite the fact that Justice Department Guidelines require an agent to report any knowledge of an informant committing violent crimes.

None of these suspicions were presented at defendants' trials. Defendants' counsel were not alerted to these specifics. That highly experienced defense counsel at Orena and Amato's trials could have made inquiries about Scarpa's informant role had they wished to, and that they could then have unearthed much of what was later divulged is highly likely. That their clients were aware of Scarpa's suspected role as an informer is equally likely. Since Scarpa's name came up a number of times at the trials, defendants could have been expected to have mentioned to counsel the suspicions permeating their

organization. That stone, however, was not turned over by the defense. Scarpa was alive. Unmasking him would probably have added to the number of well-connected turncoats already lined up as cooperating witnesses against defendants. In June 1994 this danger evaporated when, as already pointed out, Scarpa died in prison never having testified against his former comrades.

### 5. Post–Trials: DeVecchio–Scarpa Details

Months after Orena's and Amato's trials, in April 1993, Carmine Sessa, the Colombo Family Consigliere, was taken into custody by the F.B.I. Sessa agreed to cooperate with the government. His debriefings were supervised by Special Agent Tomlinson. Among other things, Sessa recounted how he began to suspect that Scarpa had a law enforcement source when, in 1987, on the eve of the D.E.A. arrests, Scarpa showed him a list of names of those in the Wimpy Boys crew that were eventually arrested. Sessa also recounted how he had discovered a bug on the Wimpy Boys telephone line, and how Scarpa remained unperturbed when Sessa showed it to him. Sessa recalled that Scarpa would regularly receive calls from a "Mr. Della" or "Mr. Dello."

In the Fall of 1993, William Meli agreed to cooperate with the Bureau. Special Agent Leadbetter conducted the debriefings. Meli's disclosures corroborated those of Sessa. In 1987, Meli had learned from Scarpa's son that his father had a friend, an F.B.I. agent who warned him of the impending Wimpy Boy arrests and Catanzano's possible cooperation. It was not until these debriefings that Special Agent Favo learned of DeVecchio's alleged 1987 leaks pertaining to the Wimpy Boys Club.

Scarpa's confederate, Lawrence Mazza began cooperating in January 1994. Both he and Parlagrecco further corroborated the account that Scarpa had received advance notice of the Wimpy Boys arrests. Scarpa also had informed Mazza that he was being supplied information from a law enforcement source, who Scarpa referred to as "the girlfriend." Whenever Scarpa received a phone call from "the girlfriend," he would interrupt whatever he was doing. When at home, Scarpa would retreat to the basement to return "girlfriend" calls. Among other things, Scarpa told Mazza that "the girlfriend" told him that the Orena faction was close to killing him. Mazza also believed that Scarpa had received from "the girlfriend" the partial address of the house in Queens at which Orena was staying.

After this series of debriefings, the Agents' suspicions passed a point of critical mass. Favo believed that DeVecchio had lost perspective due to a consuming desire to protect his source. On January 17, 1994, Favo, Leadbetter and Tomlinson went to Donald North, Special Agent in Charge of the Criminal Division of the New York F.B.I. office, to report their mounting concerns. North instructed each agent individually to prepare affidavits setting forth the information that led them to suspect DeVecchio of illegally leaking confidential law enforcement information to Scarpa. Consistent with Bureau policy, North immediately submitted a report to the Bureau's Office of Professional Responsibility ("O.P.R."). O.P.R. interviewed cooperating witnesses, F.B.I. agents, Assistant United States Attorneys and judicial officers who had had contact with Scarpa, and determined that DeVecchio was appropriately a subject of investigation. DeVecchio was transferred from the anti-mafia squad to another supervisory position within the Bureau as coordinator of drug enforcement for the northeast region of the United States. In December 1994, O.P.R. referred the matter to the Public Integrity Section of the Department of Justice for an opinion.

In connection with the instant motions, hearings were held beginning in May of 1996. Defendants called DeVecchio to the stand. DeVecchio refused to waive his Fifth Amendment privilege against self-incrimination.

In early September 1996, the Public Integrity Section finally determined that prosecution of DeVecchio was not warranted. The O.P.R. investigation was closed. DeVecchio retired from the Bureau in October 1996. Favo, whose actions were in accordance with F.B.I. policy and were in good faith designed to protect the F.B.I.'s integrity, was transferred out of New York to a less vital post.

Towards the end of February 1997, the government granted DeVecchio immunity. At final hearings in February and March of 1997 both Favo and DeVecchio testified. Favo proved a fully credible witness as to the facts, although his conclusions that DeVecchio had been deliberately supplying substantial F.B.I. information to Scarpa was not, in retrospect, fully supported. In context, and at the time in question, however, Favo's suppositions were sound and his actions appropriate and proper.

DeVecchio proved a far less credible witness whose memory lapses were not believable. That he had largely inadvertently fallen under Scarpa's spell and furnished him with some warnings to protect Scarpa personally and as a source is likely. That DeVecchio conspired with Scarpa on the side of the Persico faction or that he stirred up the War is not. The hearings demonstrated that the DeVecchio–Scarpa relationship was irrelevant to any events or evidence relied upon by the government in the Orena and Amato trials.

### 6. Defendants' Claims of Suppression

Much of the information relating to Scarpa was publicized as a result of defense counsels' efforts in trials subsequent to defendants', specifically in *United States v. Victor M. Orena, et al.,* 93 CR 1366 (Edward R. Korman, J.); *United States v. Theodore Persico, et al.,* 92 CR 351 (Charles P. Sifton, C.J.), *United States v. Anthony Russo, et al.,* 92 CR 352 (Charles P. Sifton, C.J.); and *United States v. Cutolo,* 93 CR 1230 (Eugene H. Nickerson, J.).

Petitioners claim that none of this information was known to them at the time of their own trials. They further contend that much of this evidence that pre-dated their trials was known to the government at the time of their trials, but was not properly disclosed. It is argued that at the time of Orena and Amato's trials, DeVecchio and Favo knew Scarpa was an informant and were aware of leaks to Scarpa regarding electronic surveillance, various addresses, and pending arrests, and that Scarpa had committed a number of acts of violence during the Colombo War; and that the United States Attorney's

Office knew that Scarpa was an informant for the F.B.I. who had enjoyed lenient treatment in the past, and that he was a prolific killer throughout the War.

## III LAW

### A. Rule 33

▬ Rule 33 of the Federal Rules of Criminal Procedure directs a trial court to grant a new trial "if required in the interest of justice." Fed.R.Crim.P. 33. The standard for evaluating this motion is dependent upon the particular claim asserted.

### B. *Brady* Rule

#### 1. Generally

▬ The standard applied to a Rule 33 motion grounded on a claim of the government's failure to disclose exculpatory evidence to the defendant is rooted in *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). A new trial is warranted under *Brady* when the defendant shows (1) government "suppression" of (2) evidence favorable to defendant, and (3) that the evidence is material. *Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972); *United States v. Payne,* 63 F.3d 1200, 1208 (2d. Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996).

▬ The government has an affirmative duty to disclose exculpatory evidence known to it. Even absent a defense request it is not absolved of this obligation. *United States v. Agurs,* 427 U.S. 97, 108–110, 96 S.Ct. 2392, 2399–2401, 49 L.Ed.2d 342 (1976); *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985). The government does not have a duty to seek out this sort of evidence not in its possession or constructive possession. *United States v. Beaver,* 524 F.2d 963, 966 (5th Cir.1975), *cert. denied,* 425 U.S. 905, 96 S.Ct. 1498, 47 L.Ed.2d 756 (1976).

▬ There is no distinction between exculpatory evidence and impeachment evidence for *Brady* purposes. Failure to disclose either may constitute a violation. *United*

*States v. Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380 (1985).

## 2. Suppression

■ A necessary element of a *Brady* violation is the prosecution's "suppression" of evidence. The prosecutor's obligation is far-reaching. It must manage its case meticulously. Failure to disclose evidence due to negligence, *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104(1972)("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor"), or because it simply was overlooked, *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976) ("If evidence highly probative of innocence is in his file, [the prosecutor] should be presumed to recognize its significance even if he has actually overlooked it"), are not adequate defenses for a failure to disclose. A prosecutor's good faith or lack of bad faith is irrelevant. *Kyles v. Whitley,* 514 U.S. 419, ——, 115 S.Ct. 1555, 1567–68, 131 L.Ed.2d 490 (1995); *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963).

■ The government is held to a disclosure standard based on what all its officers acting on its behalf in the case—not just the prosecutors—at the time know:

> [T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.... [T]he prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Kyles v. Whitley,* 514 U.S. 419, ——, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995); *United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996).

■ *Brady* requires communication between prosecutors and other governmental entities involved in the prosecution or investigation. There is no "serious doubt that 'procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it.'" *Kyles v. Whitley,* 514 U.S. 419, ——, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995) (citation omitted); *see also, United States v. Alvarez,* 86 F.3d 901, 905 (9th Cir.1996) ("The prosecutor must employ whatever means are necessary to discharge her obligation").

To settle for anything less than full, joint responsibility to disclose of the entire prosecutorial team would be unworkable and detrimental to our system of justice. As the Supreme Court recently reminded us in setting aside a conviction, any

> argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.

*Kyles v. Whitley,* 514 U.S. 419, ——, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995).

■ The rationale for placing full responsibility upon the prosecution inheres in the prosecutor's role as attorney for the government, which transcends that of an adversary. The prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win the case, but that justice shall be done." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). The reason for reversals in cases of a *Brady* violations is to ensure fair trials:

> not punishment of society for the misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.

*Brady v. Maryland,* 373 U.S. 83, 89, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).

## 3. Materiality

■ Materiality is central to *Brady* analysis. Constitutional error results, and a new trial is warranted, only when the "suppressed" exculpatory evidence is "material." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct.

1194, 1196–97, 10 L.Ed.2d 215 (1963); *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996). Materiality here has a special meaning. Undisclosed "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines the confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, ——, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381, 87 L.Ed.2d 481 (1985)). A *Brady* violation is established by a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at ——, 115 S.Ct. at 1566; *Payne*, 63 F.3d at 1209.

Determination of materiality under this standard is neither formulaic nor mechanical. No simple test suffices. Instead, the court must evaluate the government's failure and its effect on the trial in the light of the particular circumstances of the case. It must

> consider directly any adverse effect that the prosecutor's failure to respond [or nondisclosure] might have had on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by [the non-disclosure].

*United States v. Bagley*, 473 U.S. 667, 683, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985).

For materiality purposes, a court does not consider each item of evidence individually. The cumulative effect of all the "suppressed" evidence favorable to the defendant in the particular circumstances must be considered. *Kyles v. Whitley*, 514 U.S. 419, ——, 115

S.Ct. 1555, 1567, 131 L.Ed.2d 490(1995) (one "aspect of . . . materiality to be stressed is its definition in terms of suppressed evidence considered collectively, not item-by-item"). The defendant is not required to show an acquittal would have followed had the disclosure been made in a timely fashion. *Kyles v. Whitley*, 514 U.S. 419, ——, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) ("a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal"). Nor must a defendant "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at ——, 115 S.Ct. at 1566.

Once a violation is shown according to the *Brady–Kyles* standard, harmless-error review is not required. *Kyles v. Whitley*, 514 U.S. 419, ——, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). The finding of a *Brady* violation "necessarily entails the conclusion that the suppression must have had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (citations omitted).

## C. Newly Discovered Evidence Claims

The standard burden on a defendant in supporting a motion for a new trial based on newly discovered evidence from a neutral source is higher than that for undisclosed *Brady* evidence. The Court, in *United States v. Agurs*, stated the rationale for the difference:

> the fact that . . . evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial. If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice.

*Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976); *see also United States v. Wong*, 78 F.3d 73, 79 (2d Cir.1996);

3 C. Wright, Federal Practice and Procedure: Criminal 2d § 557.2 (1982).

A motion for a new trial based on newly discovered evidence is not favored and will only be granted when the " 'new evidence ... would probably lead to an acquittal.' " *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir.1993) (quoting *United States v. Gilbert*, 668 F.2d 94, 96 (2d Cir.1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982)); *United States v. Imran*, 964 F.2d 1313, 1318 (2d. Cir.), *cert. denied*, 506 U.S. 1009, 113 S.Ct. 626, 121 L.Ed.2d 558 (1992); *see also* 3 C. Wright, Federal Practice and Procedure: Criminal 2d § 557 (1982). The court may evaluate other factors, such as whether the defendant's failure to discover the evidence was a result of lack of due diligence, and whether the evidence is material to the issues at trial and not merely cumulative or impeaching. *See, e.g., United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir.1991); *United States v. Oates*, 445 F.Supp. 351, 353 (E.D.N.Y.), *affirmed*, 591 F.2d 1332 (2d Cir.1978); Wright, § 557, n. 3 (explaining that the origin of this exacting standard is the test set out in *Berry v. State*, 10 Ga. 511, 527 (1851)).

Thus, "[a] district court must exercise 'great caution' in determining whether to grant a retrial on the ground of newly discovered evidence, and may grant the motion only 'in the most extraordinary circumstances.' " *United States v. Imran*, 964 F.2d 1313, 1318 (2d Cir.1992) (quoting *United States v. Di Paolo*, 835 F.2d 46, 49 (2d. Cir.1987)), *cert. denied*, 506 U.S. 1009, 113 S.Ct. 626, 121 L.Ed.2d 558 (1992).

## IV APPLICATION OF LAW TO FACTS

### A. Inferences from DeVecchio's Assertion of Privilege

In assessing the strength of defendants' arguments, there was a preliminary question whether an adverse inference against the government should have been drawn from DeVecchio's blanket assertion of his Fifth Amendment privilege against self-incrimination at earlier stages of the hearings. Absent DeVecchio's testimony and defendants' opportunity to question him, whether DeVec-

chio was the source of any leaks to Scarpa and committed various other improprieties that defendants allege might have remained unresolved. Put more strongly, the issue was whether DeVecchio's refusal to testify could qualify as a vicarious admission. Defendants argue that it should have because these proceedings are in part pursuant to section 2255 of title 28 of the United States Code, and therefore, are civil in nature. *See Heflin v. United States*, 358 U.S. 415, 418, n. 7, 79 S.Ct. 451, 453, 3 L.Ed.2d 407(1959) ("a motion under § 2255, like a petition for a writ of habeas corpus (citation omitted), is not a proceeding in the original criminal prosecution but an independent civil suit"); *United States v. Somers*, 552 F.2d 108, 110, n. 6 (3d Cir.1977) (section 2255 proceeding "is governed by the rules, statutes and appellate practice controlling civil actions"); *but cf. Williams v. United States*, 984 F.2d 28 (2d Cir.1993)(timeliness of section 2255 motion measured by criminal rules); Advisory Committee Notes to Rule 1 of the Rules Governing Section 2255 Proceedings for the United States District Courts ("motion under § 2255 is a further step in the movant's criminal case and not a separate civil action").

Little, however, turns on whether a 2255 proceeding is characterized as civil or criminal in the context of the current dispute. The inference sought to be drawn was not against DeVecchio as a party or prospective party in a criminal case, putting him in danger of criminal prosecution, but against the government, his employer, which allegedly failed to develop the information now before the court in a timely manner. *Cf. Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them").

DeVecchio was not compelled to testify and he is not a party to the present proceeding. He has neither standing nor warrant to object to inferences drawn against the government. A trier may consider an employee's Fifth Amendment invocation as evidence against the employer in civil litigation. *See, e.g., Brink's, Inc. v. City of New*

*York,* 717 F.2d 700, 710 (2d Cir.1983); *RAD Services, Inc. v. Aetna Casualty and Surety Co.,* 808 F.2d 271 (3d Cir.1986); *Cerro Gordo Charity v. Fireman's Fund Life Insurance,* 819 F.2d 1471 (8th Cir.1987); *United States v. District Council of New York City and Vicinity,* 832 F.Supp. 644, 652 (S.D.N.Y. 1993); *Aetna Casualty & Surety Co. v. Rodco Autobody,* 138 F.R.D. 328, 339 n. 22 (D.Mass.1991). The decision as to whether an adverse inference can be drawn in such a situation is made case-by-case. *See, Baxter v. Palmigiano,* 425 U.S. 308, 317–18, 96 S.Ct. 1551, 1557–58, 47 L.Ed.2d 810 (1976)("no more evidentiary value than was warranted by the facts surrounding the case"); *Brink's,* 717 F.2d at 710.

For the purposes of this quasi criminal-quasi civil proceeding, it is the government's role that is challenged. The government can not use DeVecchio's tarnished shield to guard itself against a charge that it failed to ensure justice by revealing information adverse to itself.

In *United States v. District Council of New York City and Vicinity,* 832 F.Supp. 644, 652 (S.D.N.Y.1993) Judge Haight held that an adverse inference could be drawn where the witnesses who invoked the privilege "were directly involved in the dishonest acts which underlay" the plaintiff's claims, and where the witnesses had "a sufficiently close relationship to [the defendant] to have their refusals to testify qualify as vicarious admissions." Judge Haight's ruling applied a fortiori to the instant case, where it is the government as prosecutor which is charged with acting improperly through its employee.

DeVecchio at first declined to testify about allegations of his own improprieties in connection with his duties in assisting the government's investigation and prosecution of these defendants, which are at the very heart of these section 2255 proceedings. At the time DeVecchio invoked his privilege, he was still an F.B.I. supervisory agent, employed by the Department of Justice.

The court was prepared to draw reasonable inferences adverse to the government from DeVecchio's silence about his acts as an F.B.I. Supervising Special Agent. It tentatively concluded on the basis of the evidence and DeVecchio's refusal to testify, for the purposes of the instant proceedings, that DeVecchio did, over the years, leak information to Scarpa, ranging from the imminent Wimpy Boys arrests to the partial address of the house at which Orena was staying.

In any event, once immunity was granted and DeVecchio testified, the probative force of his prior reliance on the privilege and adverse inferences to be drawn were attenuated almost to the vanishing point as proof of wrongful conduct. At most, the earlier claim would affect evaluation of his credibility as a witness. As already remarked, that credibility was determined to be poor based on his testimony itself.

 Lack of credibility as a witness is not, in itself, affirmative proof of what the witness denies. *See Dyer v. MacDougall,* 201 F.2d 265 (2d Cir.1952)(Hand, J.); John H. Mansfield, Norman Abrams, Margaret A. Berger, et al., Evidence Cases and Materials 73–75 (8th ed.1992) (effect of negative credibility as affirmative proof); *cf. id.* at 1423–24 (comment on prior claim of witness who testifies). In the context of this case, proof of DeVecchio's wrongful conduct with Scarpa is based on other evidence so that his lack of credibility in denying improprieties and his prior invocation of the privilege does somewhat strengthen the case of the moving parties. *See United States v. Certain Real Property and Premises Known As: 4003–4005 5th Ave., Brooklyn, N.Y.,* 55 F.3d 78, 85 (2d Cir.1995) ("how a trial court ... should react to any motion precipitated by a litigant's [or witness'] assertion of the Fifth Amendment in a civil proceeding ... necessarily depends on the precise facts and circumstances of each case"); *cf. United States v. Incorporated Village of Island Park,* 888 F.Supp. 419, 431–2 (E.D.N.Y.1995) (where defendants had previously invoked privilege at deposition, their affidavits in opposition to summary judgment may be precluded, and government may rely on earlier assertion of privilege "to confirm matters supported by other independent evidence"); *but cf. United States v. Tomaiolo,* 249 F.2d 683, 690–92 (2d Cir.1957) (prosecution's introduction of witness' earlier assertion of privilege before the grand jury for purposes of impeachment

can constitute a ground for reversal of conviction of the party for whom he testified where the issue of the witness' credibility was so negligible as to be outweighed by the impermissible impact upon the jury).

Nevertheless, as set forth below, *infra* section IV(B)(3), the more damaging specific inferences defendants wish that the court draw are wholly different matter. The inferences reasonably to be drawn from the silence of the witness or from his earlier assertion of privilege cannot support the heavier weight of pervasive corruption that defendants press upon the court.

### B. *Brady* Claim

#### 1. Suppression

Defendants' principal argument is that a new trial should be granted because the government violated its duty, under *Brady*, to disclose evidence showing that Scarpa was a long-standing confidential informant for the F.B.I.; that DeVecchio was Scarpa's handler; that DeVecchio illegally provided Scarpa with confidential information over the course of many years; and that at least one of DeVecchio's F.B.I. associates, Special Agent Favo, was agitated about what he perceived as DeVecchio's misconduct in handling Scarpa. *See supra* section II(C)(6).

 The first element of *Brady* analysis requires proof that the government "suppressed" the evidence in question. There is no doubt that at the time of defendants' trials, agents of the government knew, and did not disclose, that Scarpa was an informant. It is self-evident that DeVecchio, himself, possessed evidence related to this fact, having worked with Scarpa since at least 1980. Special Agent Favo also knew in general terms of Scarpa's role as an informant, as did members of the United States Attorney's prosecution team—Assistant United States Attorneys Andrew Weissman, George Stamboulidis, and John Gleeson.

 There was, however, no "suppression" of evidence of this naked fact of informer status. The court concludes that defendants knew, or should have known, that Scarpa was likely to have been an informant. There is no "suppression" where defendant

or his attorney " 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.' " *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir.1993) (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d. Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983)); *see also United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996). At the bare minimum, defendants were on notice as to the likelihood that Scarpa was an informant. Evidence suggesting that Scarpa may have been an informant was adduced during both trials. For instance, the Ambrosino car tapes contained references to this fact. *See, e.g.*, Orena Trial Transcript at 1153–54 (discussing a June 1992 tape recording concerning belief that Scarpa was a "rat"). Ambrosino also testified that the Persico faction Thanksgiving Day plan to kill Orena captain "Wild Bill" Cutolo was suspended because of the November 28, 1991 *Daily News* article reporting that Scarpa was an informant. *Id.* at 909–10; *see also, United States v. Persico et al.*, 92 Cr 351 (Charles P. Sifton, C.J.), slip op. at 20 (E.D.N.Y. Feb. 18, 1997) (" 'everybody mistrusted Scarpa because they believed he was an informant' ").

 Beyond this, remaining still to be considered is the collection of evidence related to DeVecchio's alleged leaks to Scarpa—e.g., evidence pertaining to the electronic surveillance at the Wimpy Boys Social Club, the pending arrest of Scarpa on the federal credit card charges and of the Wimpy Boys crew after the D.E.A. investigation, Imbriale's decision to cooperate, and the addresses of Scarpa's loanshark victims—and evidence related to Favo's concerns about DeVecchio's conduct in that relationship. It is self-evident that DeVecchio had knowledge of facts surrounding allegations about his own transmittal of confidential information to Scarpa, as did Special Agent Favo, who had a well-developed suspicion of DeVecchio's relationship with the informant. The prosecutors did not personally know of DeVecchio's possible leaks to Scarpa and harbored no suspicions about DeVec-

chio's conduct at the time of the trials. However, for *Brady* purposes, evidence related to this information was "suppressed" by the government in spite of the prosecutors' lack of knowledge.

As previously noted, the government's duty to disclose is not limited to only that information in the possession of or known to the prosecutors; the duty extends to the police and investigators and other investigatory arms of the state teamed with the prosecutors on the particular case. *Kyles v. Whitley,* 514 U.S. 419, ——, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995) ("The individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police"); *Smith v. Secretary of New Mexico Department of Corrections,* 50 F.3d 801, 824 (10th Cir.1995) (same; "investigative officers are part of the prosecution, [and] the taint on the trial is no less if they, rather than the prosecutors, were guilty of nondisclosure") (citations omitted), *cert. denied, Mondragon v. Smith,* —— U.S. ——, 116 S.Ct. 272, 133 L.Ed.2d 193 (1995).

Thus, as in *Kyles,* where the Court rejected Louisiana's argument that the requirement of a new trial should not apply in circumstances where the *Brady* material was known only to the police, here government "suppression" exists even though only Special Agents DeVecchio and Favo possessed the *Brady* information in question. Both Special Agents of the F.B.I. were deeply involved in the cases, and acted as investigatory arms of the prosecution. *See Kyles v. Whitley,* 514 U.S. 419, ——, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995); *see also, United States v. Herring,* 83 F.3d 1120, 1122 (9th Cir.1996); *Wedra v. Thomas,* 671 F.2d 713, 717 (2d Cir.), *cert. denied,* 458 U.S. 1109, 102 S.Ct. 3491, 73 L.Ed.2d 1372 (1982); *United States v. Morell,* 524 F.2d 550, 555 (2d Cir. 1975) (prosecutor obligated to turn over Brady material possessed by D.E.A. agent where agent had served as an "arm of the prosecutor" by supervising informant, participating actively in the investigation, and sitting at prosecutor's table); *but cf. Pina v. Henderson,* 752 F.2d 47, 49 (2d Cir.1985) (no

*Brady* violation where parole officer's knowledge could not be imputed to prosecutor).

The evidence pertaining to DeVecchio's relationship with Scarpa and Favo's concerns may be construed as favorable to defendants and is *Brady* material. .It should have been made available to the defendants.

### 2. Defendants' Materiality Arguments

■ Information not disclosed to the defense creates constitutional error warranting a new trial only when that information is material, that is to say only when it "creates a reasonable doubt that did not otherwise exist." *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976).

In making the materiality determination, the fact that DeVecchio was Scarpa's handler, the collection of evidence relating to DeVecchio's alleged leaks, and evidence of Favo's concerns must not be disaggregated, but must be considered collectively. *Kyles v. Whitley,* 514 U.S. 419, ——, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490(1995) (one "aspect of . . . materiality to be stressed is its definition in terms of suppressed evidence considered collectively, not item-by-item"). Relying on this *Kyles* formulation, defendants weave an intricate and dark—almost demonic—tapestry out of the undisclosed evidence (and other related unascertained information they presumably would have unearthed and exploited had disclosure been made). They assert that this imaginative opus—a "record" in defendants' lexicon—establishes a factual basis for a powerful alternative theory encompassing all charges and defenses that could have been presented at trial had there been no "suppression."

The general premise is that Scarpa was a violent free agent who operated with impunity and with a license to kill granted by DeVecchio. After years of relentless criminal activity contemporaneous with leaks and assistance from his handler, Scarpa—in effect a double agent—came to believe that he was essentially untouchable. Thus, so defendants' theory goes, Scarpa, unacquainted with and unhampered by fear of negative consequences, murdered Ocera of his own accord and then, two years later, encouraged

by DeVecchio, initiated the Colombo War. Defendants would have argued at the trial, they now suggest, that F.B.I. Special Agent DeVecchio colluded with Scarpa to foment the mafia war.

By pyramiding inferences defendants "demonstrate" how the undisclosed evidence could have supported this all-embracing theory of all-encompassing guilt of all crimes by the unholy DeVecchio–Scarpa alliance. Defendants argue that they have thus shown that the "suppressed" favorable evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley,* 514 U.S. 419, ——, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). Q.E.D., defendants argue, the undisclosed information is material and a *Brady* violation exists. This conclusion requires crossing the line from rationality to paranoia.

### a. Ocera Murder

Both Orena and Amato were convicted for their participation in the Ocera murder. As noted, they contend that they would have argued that it was Scarpa who killed Ocera, not out of fealty to Orena, but on his own and for his own reasons, believing that his special relationship with DeVecchio made him impervious to arrest and prosecution. Their theory would have provided the jury with a "story" of the Ocera homicide to rival the government's. *See United States v. Shonubi,* 895 F.Supp. 460, 487–88 (E.D.N.Y.1995) (trier's use of story-line to draw inferences), *vacated on other grounds,* 103 F.3d 1085(2d Cir.1997).

To raise an inference that Scarpa had developed a belief in his immunity, defendants would have pointed to some of the undisclosed evidence: Scarpa's some thirty year relationship with the F.B.I., his nine year relationship with DeVecchio, and DeVecchio's regular insulation of him from the consequences of his criminal activity (e.g., possibly leaking the pending arrest in the 1986 credit card case, the Wimpy Boys arrests, and Catanzano's likely cooperation with law enforcement). Scarpa, the defendants would have pointed out, was never arrested or prosecuted, with the exception of the credit card case, and even then he was tipped-off and allowed a reprieve as a result of DeVecchio's intervention. After years of unbridled transgressions without so much as a rebuke, the argument goes, Scarpa naturally would have fancied himself invincible.

Defendants also argue that they would have further supported this theory by demonstrating Scarpa's willingness and propensity to act criminally for his own gain. They would have brought forward evidence of Scarpa's history of violence throughout the 80's and during the Colombo War, and attempted to define those acts as having been committed in pursuit of a personal agenda. With this propensity as a backdrop, the attempted killing of Ocera could have been framed as yet another unilateral act in a long line of egocentric moves. Thus, defendants contend, they could have shed different light on Montesano's testimony about being stalked by someone who might have resembled Scarpa on a night a couple of weeks before he was murdered. Under defendants' theory, Montesano's testimony could be viewed as a description of a failed attempt engineered by Scarpa himself to destabilize the Colombo Family and incite violence within it.

Defendants insist that had they been properly informed of the undisclosed details prior to the trials their story would have rebutted the basic premises of the government's case. In fact, during their trials, defendants had offered no rebuttals and Scarpa's propensity toward violence signified only that meaning the government attributed to it: promotion of the Colombo Family through the acts of an obedient subordinate. Defendants would have argued that Scarpa's state of mind in 1989 was not that of an active and loyal co-conspirator of Orena, but that of a self-interested free agent. They contend that, given their alternative theory of the offense, a rational jury would have rejected the government's analysis and inferred that it was Scarpa who finished the job he had set out to do a few weeks before. Even if a rational juror might not have so concluded, defense counsel urge that their skill as advocates would have played on the irrational and the general sense of fairness of jurors sufficiently to have

instilled a reasonable doubt. The undisclosed evidence would, they think, have provided a powerful intellectual laser-beam to riddle the government's case with reasonable doubt.

Defendants also now contend that they would have undermined the credibility of Special Agent Favo, the principal law enforcement witness on the murder charge and the case agent for Amato's prosecution, by arguing that by the time of the trials, Favo had already concluded that DeVecchio was "compromised." They would have done so by pointing to Favo's knowledge of DeVecchio's alleged Wartime leaks to Scarpa (e.g., that Imbriale was an informant and the addressed of Scarpa's loansharking victims), the "We're gonna win this thing" reaction to the Lampesi murder, and the attempts to shield Scarpa from prosection. They would have argued that Favo's failure to report DeVecchio demonstrated a predisposition to withhold the truth. They would have impeached Favo on grounds of bias and interest by attempting to raise the inference that Favo had personal motives to obtain a homicide conviction against Orena. Favo, the defendants would have argued, wanted to perpetuate a cover-up of Devecchio's misconduct in order to vindicate himself, preserve his professional reputation and minimize the potential negative consequences to the F.B.I. of DeVecchio's actions.

What's more, defendants assert that they would have tarred larger aspects of the investigation and prosecution. They would have brought the credibility of Maffatore and Bonfiglio into question. Favo was the Special Agent responsible for securing their cooperation and conducting Maffatore's consensual recording of Bonfiglio, and defendants contend that a rational jury could infer that Favo's personal interest in seeing Orena convicted infected his handling of these two witnesses.

Thus, defendants argue, the undisclosed evidence is material to the Ocera murder charges, because there is a "reasonable probability ... the result of the proceeding would have been different," *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985), had they been able to press this alternative theory of the offense and their challenges to witness credibility. *See infra* section IV(B)(2)(c).

**b. War Conspiracy**

Defendant Orena marshals essentially the same argument—although in more inflammatory form—to show the materiality of the undisclosed evidence to the War conspiracy charges. Amato was not similarly charged and convicted.

Here again, Orena argues that had the undisclosed information been available, he would have propounded a theory of the events comprising the Colombo War that could have competed with, and rebutted premises of, the government's theory that the Colombo War broke out because of Orena's quest for power.

Orena would have argued that it was not he, but Scarpa who had an insatiable thirst for power. It was Scarpa who ignited and perpetuated what appeared to be an internecine war, and different from the Ocera murder theory, he did so with explicit authorization and direct assistance of the eminence grise, DeVecchio. DeVecchio, it would have been argued, wanted the Persico side to emerge victorious in the War. Orena would have argued that his own actions were that of a man backpedaling defensively; he did not engage in any offensive actions to control the family. So powerful a theory, Orena contends, would have exerted a seismic force upon the government's case, shifted its entire focus, and created a reasonable probability of a different result. Scarpa's prolific violence during the War would have been cast in a different light. Rather than acts of a subservient loyal Persico soldier responding to Orena's power-grab, a jury could have interpreted them as the acts of the War's central antagonist bent not only on his own gain within the Colombo Family but with an unusual subsidiary charitable interest in giving a bit back to the F.B.I. handler who had provided him with so much.

The same portions of the undisclosed information underpinning defendants' theory of the Ocera murder would have been exploited here, too. *See supra* section IV(B)(2)(a). For example, Orena would have pointed to all

of DeVecchio's alleged leaks and indiscretions to raise the inference that the two were in cahoots. In particular, Orena argues that DeVecchio's supposed leak of Orena's address, his Wartime efforts to shield Scarpa from arrest and his "We're gonna win this thing" exclamation would have illustrated to the jury DeVecchio's corruption and his collusion with Scarpa. Examples of Scarpa's history of violence would have established his propensity to initiate the so-called War.

As to Scarpa's motives—to eliminate Orena and to expose others to arrest—Orena would have enlisted a number of the nondisclosures for support. For example, an F.B.I. form 209 documenting Scarpa's view that the War would end only when Orena was killed or arrested would have supported the existence of the first motive. Orena would have pointed to the details and duration of Scarpa's relationship with the Bureau and his handler to raise the inference that Scarpa perceived the relationship as symbiotic, and that it motivated him to generate arrests. Since DeVecchio insulated Scarpa from the consequences of his often blatant criminal activity, so the theory goes, it would not have been unreasonable to conclude that Scarpa had a reciprocal sense of loyalty to the F.B.I. and his handler, and was actuated by it to provide them a helping hand in concocting a case against Orena.

Through this lens, Orena contends that he could have rebutted major premises of the government's case. For example, in contrast to the government's placing of Orena at ground zero of the Colombo War by theorizing that he had ordered the shooting of Scarpa on November 18, 1991, Orena could have argued that Scarpa fabricated the shooting to ignite a "War" to further his and DeVecchio's own goals. For support, Orena would have pointed to the lack of dispositive evidence connecting Orena to that event (Favo had not written a report of his post-shooting meeting with Scarpa, and the New York City Police Department failed to find, collect or keep solid, dependable evidence clearly linking Orena to the shooting). Orena contends that had he exploited these areas of inquiry, the shooting could have been more easily understood by the jury as a hoax

by Scarpa than as a product of an Orena directive. As it was, Orena points out, these areas were not exploited because, absent the undisclosed evidence, he had no alternative theory.

Similarly, Orena would have argued that the Coles Directories and Toll Records seized in the April 1, 1992 search of his girlfriend's house were not evidence of his efforts to track down and kill Persico rivals, but were to be used solely for defensive purposes against attacks by a pack of wolves led by Scarpa. Orena feared that someone had discovered his location and was trying to kill him. He possessed the directories and records in order to reveal who was trying to track him down. As circumstantial support, Orena would have pointed to the fact that he was in hiding at his girlfriend's house. He would have offered select statements on the Audino tapes as evidence of his wariness. That Orena's address had been leaked to Scarpa, and that Scarpa was so exuberant a shooter in the War would have further supported the plausibility of a theory that Orena's posture was defensive rather than offensive.

Similar contentions would have been made about the evidentiary value of the Audino tapes. In contrast to the government's theory that the tapes show that Orena possessed guns for the purpose of maintaining control of the Family, Orena would have argued that the tapes showed that he and his crews possessed guns for self-defense and out of fear of Scarpa.

Finally, Orena asserts that he would have been able to explain away the cache of guns uncovered under the deck of his girlfriend's Valley Stream house. The guns were not his, but were planted by Scarpa as evidence to incriminate Orena and to enhance Scarpa's stature with DeVecchio. As the argument goes, Scarpa had the motive. Plausibly, DeVecchio could have leaked the Valley Stream address to Scarpa. That DeVecchio may have leaked to Scarpa the partial address at which Orena was staying in Queens, as well as other information that could only be used for illegal purposes (e.g., identifying Catanzano as a cooperator, and providing the addresses of Scarpa's loanshark victims) would

have supported this hypothesis. Evidence that the F.B.I. never tested fingerprints on the bag, and then lost it would have been similarly supportive of this theory, Orena would have argued. Thus, under Orena's present hypothesis, the planted cache of guns was Scarpa and DeVecchio's coup de grace—the final shot that would have put Orena away, and would have removed the most intransigent obstacle to Scarpa and DeVecchio's violent campaign to have Scarpa enthroned as Acting Boss of the Colombo Family.

### c. Remaining Charges

Defendants argue that the undisclosed evidence of DeVecchio's misconduct could have supported a theory leveled against the investigation as a whole, which would have undermined its integrity and wiped out the remaining charges in the indictment. Absent the undisclosed information, defendants had no means of making this wholesale challenge.

Defendants would have argued that, as the Special Agent supervising the Colombo Family investigatory squad, DeVecchio was instrumental to the case and prosecutors relied upon him to formulate it. He had detailed knowledge of the Colombo War investigation, and much of his information came from Scarpa. DeVecchio was in a position to steer the investigation away from Scarpa and personally influence the course of events which were ascribed to the Colombo War. Defendants assert that they reasonably would have argued that DeVecchio assisted Scarpa in developing and planting evidence against Orena, and that cooperating witnesses were coached.

In support for this theory, defendants would have relied upon many of the same pieces of undisclosed evidence that would have supported their other theories. Suffice it to say that defendants would again recite the myriad examples of DeVecchio's alleged assistance to Scarpa to buttress their assertion that an inference could have been raised that DeVecchio was predisposed or inclined to steer the investigation away from Scarpa. DeVecchio's supposed leak of Orena's partial address and his "We're gonna win this thing" exclamation would have indicated DeVec-

chio's own animus toward Orena and his collusion with Scarpa.

Against the backdrop of DeVecchio's leaks and Scarpa's apparent immunity from prosecution, defendants would have argued that the Colombo squad's failure to impede Scarpa until late August 1992 and its focus upon Orena and his associates would have invited, at the very least, serious doubt as to the thoroughness and integrity of the investigation. As the O.J. Simpson case and many others demonstrate, destroying the bona fides of the police is a tactic that has never lost its place in the criminal defense reasonable doubt armamentarium. See, e.g., Alan M. Dershowitz, Reasonable Doubts 68 (1996) ("police perjury—generally committed in order to save a case—can sometime backfire and destroy that case"); see also, Kyles v. Whitley, 514 U.S. 419, ——, 115 S.Ct. 1555, 1571–74, 131 L.Ed.2d 490 (1995) (disclosure would have enabled defense to question the thoroughness and good faith of the police investigation of homicide). Defendants allege that they would have brought all of this information before the jury by cross-examining DeVecchio or calling him to the stand as a defense witness. Scarpa would not, they suggest, have been able to make the case against Orena under such conditions, even if he had testified.

### 3. Suppressed Evidence Not Material

### a. Defense Theories Not Supported By Suppressed Evidence

In spite of defendants' imaginative efforts to show how the "suppressed" evidence would have been utilized, they have failed to show how it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict, as Kyles requires. Kyles v. Whitley, 514 U.S. 419, ——, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995); United States v. Payne, 63 F.3d 1200, 1209 (2d Cir.1995), cert. denied, —— U.S. ——, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996). Defendants fail because the theory they attempt to spin out of the undisclosed evidence can not be supported by that evidence. Moreover, the theory is such an extravagant and far-fetched distortion that, when viewed in the context of the com-

plete record, it is not reasonably probable that it would "create[ ] a reasonable doubt that did not otherwise exist." *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976). As a result, defendants are not entitled, under *Brady,* to a new trial or dismissal of the indictment as to any of the offenses for which they were convicted.

The court does not find that the evidence supports any but the most peripheral—and then, inadvertent—leaks by DeVecchio. For the purposes of the argument, however, it will assume that DeVecchio was the source of any leaks, that they were advertent, and that there were no other law enforcement leakers. Even so, rejecting DeVecchio's suggestion in his testimony that there were sources other than himself for Scarpa's knowledge, and putting the worst possible light on what Favo observed—for the purpose of weighing the defense claims—does not get defendants far enough to warrant a new trial.

The fact that Scarpa was a confidential F.B.I. informant who arguably may be inferred to have received valuable law enforcement information from his handler over the course of a more than decades-long working relationship is sufficient to show that they were close. DeVecchio's possible willingness to provide Scarpa with information that would place individuals in jeopardy—e.g., Catanzano, Scarpa's loansharking customers, Miciotta, even Orena—would certainly be troubling. Similarly, that Special Agent Favo was concerned about the intimacy of that relationship and suspected that DeVecchio was "compromised" doubtless suggests that DeVecchio was in need of supervision, and that Scarpa should not have been dealt with, contrary to Bureau procedure, by DeVecchio alone.

Even accepting these assumptions, and acknowledging the Scarpa–DeVecchio connection's troubling coziness, does not warrant the further inferences that Scarpa had a license to kill bestowed upon him by DeVecchio, that he committed the Ocera murder, that he initiated and fueled a faux Colombo War to consolidate his power, and that he did all this with DeVecchio's authorization and assistance. Even if all the information defendants have presented in their "record" were found to be subject to *Brady*—and it is not, *see supra* section II(C)(5) and *infra* section IV(C)—the sum of it would still be insufficient to support so fantastic a theory.

Allowing accumulations of vague suspicions supported by conveniently arranged evidence to give rise to misleadingly dark conclusions of deep, dark governmental conspiracies is a not uncommon process in today's lay world. It does not suffice in court. A rational and appropriately rigorous assessment of evidence and of assumptions underlying suspicions counsels caution. Defendants have failed to show that there is a "reasonable probability" that the "suppressed" evidence would have led a rational jury to reach the evil, facile conclusions defendants wish to draw. *See, e.g., United States v. Persico,* 92 Cr 351 (Charles P. Sifton, C.J.), slip op. at 62 (E.D.N.Y. Feb. 18, 1997) ("The fact that jurors might have reacted irrationally to the revelations does not undermine confidence in the verdict").

The starting point for assessing the materiality of the suppressed evidence is examination of the DeVecchio–Scarpa relationship in the context of law enforcement practice. Associations between investigatory agencies and their informants are often necessarily characterized by fraternism. Information-trading on a "friend-to-friend" basis is an important, and at times vital, means for these agencies to insure a productive flow of reliable information. *See* Ira Silverman, *Capital Cop,* The New Yorker, July 29, 1996, at 24 (describing how a "legendary" Washington D.C. police detective cultivated close relationships with informants, giving his home phone number and describing them as "friends," in order to insure productivity). Mutual trust must be established. By the very nature of their roles, informants place themselves at great risk should their status be discovered. A handler must establish that he is worthy of confidence, that he can be discreet, and that the information the informant shares will not be revealed on the street and result in harm to the informant.

Disreputable though it appears, these associations may involve an amicable quid-pro-quo, given in the form of money, information,

or promises of protection from arrest or severe punishment for crimes in exchange for information. Such exchanges may sometimes be a necessary evil, whether running local criminals, foreign spies, or potential terrorists. *See, e.g.,* Clifford L. Karchmer, *Keeping Informants Under Control,* N.Y. Times, Aug. 3, 1981, at A15:

> Informants work under terms that can appear confusing until it is realized that investigators normally strike bargains without supervisory review.
>
> Ground rules are usually as amoral as the law of supply and demand, which dictates much informant activity. Agents wanting scores of street-level drug busts can recruit informants to part with cheap information on pushers. Mid-level dealers come more expensively: Contingent fee terms may be calculated for each enforcement target. Highly productive informants may be given de facto license to deal or steal.
>
> Local investigators rarely can pay informants money but they can create an alternative resource by removing the threat of arrest and converting it into immunity from arrest.

As a practical matter, an informer must have some incentive to take on the risk inherent in assuming this role.

Investigative agencies utilizing informants routinely tolerate and sanction some continuing criminal activity. *See, e.g.,* Attorney General's Guidelines on F.B.I. Use of Informants and Confidential Sources § (F)(1)(a) (1980) (sanctioning criminal conduct on the part of informants where necessary "to establish and maintain credibility or cover with persons associated with criminal activity under investigation"). In fact, "such conduct may well be necessary to the law enforcement enterprise." *United States v. Fischel,* 686 F.2d 1082, 1094 (5th Cir.1982) ("Law enforcement officials cannot be expected to rely only on informants with pristine characters.... That [an informant] may have traded in narcotics to establish his credibility does not, by itself, amount to outrageous governmental behavior"). Fastidiousness in working with informants or double agents can be costly. *See* Anthony Cave Brown,

Bodyguard of Lies 60–61 (1977) (J. Edgar Hoover's rejection on moral grounds of assistance from Dusko Popov, a double agent for British intelligence who was serving the German Abwehr gathering data for Japan on Pearl Harbor, may have prevented the United States from obtaining advance information on the Japanese attack; the questions asked of informers may give them more critical information than they supply).

Although not intuitively obvious, criminals and law enforcers are in a symbiotic relationship in which the promotion of informants is of mutual benefit. Law enforcement agencies have a practical interest in their informants rising through the criminal ranks, or, in the analogous case of spies, positions of civil and military power. The closer to the top an informant rises, the more valuable the information he or she will have to share. *See* Clifford L. Karchmer, *Keeping Informants Under Control,* N.Y. Times, Aug. 3, 1981, at A15 (Informants "burrow into underworld (and dissident) organizations to betray trusting cohorts. The deeper they go, the more immersed they can become in criminal ventures that they never abandon, increasing their value to the employing agency as they maneuver closer toward underworld inner sanctums"); *cf.* James Thomas Flexner, Washington, The Indispensable Man 142(1996) (Benedict Arnold was induced by the enemy he and his wife had consorted with to seek the post of Commander of West Point, the army's major fortification, so that by an arranged capture the British could use the Hudson as "a watery wall cutting the rebellion in half"); G.J.A. O'Toole, Honorable Treachery, A History of U.S. Intelligence, Espionage and Covert Action from the American Revolution to C.I.A. 3 (1991) (revolutionary war espionage by Americans).

Even the courts are deeply enmeshed and partners in the complex civil-criminal justice enterprise. They recognize and enforce the deals and promises that help induce and protect the criminal-informers. The critical role of the courts in this netherworld of perdition is specifically recognized by the Federal Rules of Criminal Procedure and the Sentencing Guidelines as necessary. *See, e.g.,* Fed.R.Crim.P. 11(e) (plea agreement proce-

dure and court's rejection or acceptance); U.S.S.G. § 5K1.1 (court's authority to reduce sentence for "substantial assistance in the investigation or prosecution of another person"); Fed.R.Crim.P. 35(b) (reduction of sentence "to reflect a defendant's subsequent, substantial assistance" to the government, upon motion of the government).

Drawing the line between the value of an informer and the unreasonable risks of encouraging serious criminal activity requires judgment of senior supervisors with sound ethical compasses; people in the field are often not in a position to provide the necessary direction. *See, e.g.,* Tim Weiner, C.I.A. Severs Ties to 100 Foreign Agents, Acts of Murder and Other Crimes Outweighed Value as Informers, N.Y. Times, March 3, 1997, at A12 (decision by C.I.A. headquarters to sever ties with informants despite assertions of station chiefs and covert operators that the C.I.A. "could not recruit saints to spy on sinners"; "if the C.I.A. had to dine with the devil, it should bring a long spoon").

The F.B.I. does exercise this kind of control at the supervisory level in Washington and locally, rejecting the payment of enrolled informers committing serious crimes. *See* Attorney General's Guidelines on F.B.I. Use of Informants and Confidential Sources § (G)(3) (1980). In the case of Scarpa, these administrative controls failed to work because DeVecchio was not properly supervised locally and because, contrary to his testimony, he failed to inform his supervisors in Washington of the probability that Scarpa was engaged in violence.

DeVecchio's relationship with Scarpa must be viewed in the real world law enforcement context. That DeVecchio from time-to-time fed Scarpa information helpful to him, zealously protected him, and that he may even have seemed to those outside the relationship to be compromised is not, without more, demonstrative of the wickedness which defendants hypothesize.

Defendants attempt to confuse the present issue by casting their motions as turning mainly on DeVecchio's culpability, criminal or otherwise. There are other fora in which that question has been addressed, notably the Office of Professional Responsibility and the Department of Justice Public Integrity Division investigations. The existence of potential culpability on DeVecchio's part is not sufficient to merit relief under *Brady.* Materiality demands more than creative circumstantial arguments of the sort presented by defendants.

None of this is to excuse or perfunctorily dismiss what appear to have been transgressions on DeVecchio's part. But DeVecchio and Scarpa's relationship reflects, to a degree, the manner in which the F.B.I. and other investigatory agencies conduct business with top echelon informants, and the hazards associated with doing so. Instead of what defendants argue, some of DeVecchio's more serious transgressions are rather demonstrative of the fact that even a respected, seasoned veteran law enforcement agent can have lapses in judgment, failures in maintaining proper perspective and unfortunate slips in ability to participate in what is an inherently treacherous and ambiguous relationship.

For example, that DeVecchio contacted an Assistant United States Attorney upon learning of Scarpa's arrest and advised that he be released on bail is not inherently suspicious. A handler's belief that an informant is more valuable on the street than in jail is reason enough to make such a request of a prosecutor and is generally within appropriate law enforcement discretion. In DeVecchio's case, given Scarpa's indictment on charges including three murders, better judgment should, hindsight argues, have cautioned that such a request was not appropriate.

It need not be doubted that DeVecchio's and Scarpa's intimacy exceeded the bounds of effective law enforcement. Favo's concerns about DeVecchio speaking too loosely, and having blurred the line, with his informant were well-founded. Favo and other Special Agents did the right thing by raising their concerns with Supervisor North. DeVecchio should have been more closely supervised.

The court credits the government's assurance that in the future supervisors running informants will themselves be supervised in order to more sharply and appropriately

draw the line between informer and informed. DeVecchio's testimony that his superiors in New York and Washington knew that Scarpa was suspected of committing multiple murders while he was an informant is found to be untrue. The court does, however, credit DeVecchio's testimony that informers commonly lie about their own criminal activities and that had he asked Scarpa whether Scarpa was committing murders he would have denied it.

The notion that DeVecchio or the F.B.I. fomented the Colombo War in a deliberate attempt to assist the Persico faction, or even tainted the investigation, flies in the face of the facts. Had the jury been presented with such a claim, it would have been shown by overwhelming evidence to have been demonstrably false and an egregious distortion of the record. As noted, the F.B.I. and those agents DeVecchio supervised, as well as others, went to great lengths to prevent violence against either side in the War. *See supra* section II(A). As part of its strategy to prevent hit teams from shooting anyone, the F.B.I. focused on getting guns and shooters off the street. Thirty-five of the first thirty-seven arrests were for firearms possession. On a number of occasions, the F.B.I. intervened to disrupt known Persico faction attempts on the lives of Orena factionalists, including defendant Amato. Of the 123 arrests of Colombo Family members made during the War, sixty of those arrested were Persicos. Prior to Scarpa's arrest on August 31, 1992—the date up to which any Scarpa–DeVecchio conspiracy could have functioned—twenty-four of the fifty-four Colombos arrested were Persicos. Since the Persico faction was one-third the size of the Orena group, proportionately many more of the Persico people were prosecuted. These figures can not support a charge of an imbalanced, tainted investigation tilted in favor of Persico's henchmen.

Over half of the prosecutions in the Eastern District of New York have involved those on the Persico side. In retrospect, when DeVecchio declared "We're gonna win this thing," he meant only that law enforcers would successfully prosecute and destroy on behalf of the F.B.I. and the Department of Justice all elements of a major portion of New York's mafia. His prediction proved largely correct.

**b. Assessment of Materiality Must Be Time–Sensitive**

Even assuming, arguendo, that the cluster of nondisclosures could in fact support the nefarious inferences defendants assert they would have raised, there still would be no finding of a *Brady* violation. There was nothing to suggest that the undisclosed evidence was material at the time of the trials and that the government had a duty to disclose.

▇▇▇ It is true that the government has the responsibility to determine when the sum of undisclosed evidence reaches a level where disclosure is warranted:

> While the definition of ... materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden. On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached.

*Kyles v. Whitley,* 514 U.S. 419, ——, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995).

▇▇▇ In reviewing *Brady* claims, whether or not the government met this burden is not to be assessed with the benefit of 20/20 hindsight. The burden must be understood as that carried by the prosecutor at the time defendants claim the information should have been disclosed in light of what was known at that time. The court in *United States v. LaRouche Campaign,* 695 F.Supp. 1290, 1296 (D.Mass.1988) explained that:

> [b]ecause the meaning of "exculpatory" for any particular claim of a *Brady* violation must be determined in relation to an identifiable issue in the case, it is necessarily

implicit in the standard for determining *Brady* obligations that any determination as to whether the government had a *Brady* obligation of disclosure of information at any particular time depends on what was or reasonably should have been known to the appropriate government representative(s) *at that time.* This is so for the reason that one cannot know what the issues will be in dispute, under substantive criminal law definitions charged and any affirmative defenses asserted, without first knowing enough about the evidence on which the government relies and on which defendants may rely to be able to identify what are the legally relevant issues. From the foregoing point it follows that any determination as to the existence or nonexistence of a *Brady* obligation of disclosure must be time-sensitive. It must be made on the basis of what was or should have been known to the government (through its appropriate representatives) at the time when the obligation is claimed to have arisen.

*Id.* (emphasis in original).

The nature of defendants' claim makes the *LaRouche* language particularly apt. Time-sensitive analysis is less important where the *Brady* material is, for instance, a "suppressed" admission of guilt by another suspect or a smoking gun in the hands of someone other than the defendant. In that sort of situation, the issue is cut-and-dried and timing has little bearing upon a prosecutor's ability to recognize the materiality of the evidence. But here, as defendants argue, the materiality of the "suppressed" evidence is rooted in its value as support for alternative theories at trial. As in *LaRouche,* more sophisticated analysis is required. The Supreme Court has advised:

> The reviewing court should assess the possibility that such effect might have occurred in light of the totality of circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled.

*United States v. Bagley,* 473 U.S. 667, 683, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985).

Put another way, it must be asked whether, at the time of trial, the defendants' present theory was reasonably foreseeable to the government or was so obscure that it was not even on the government's radar screen.

Applying the required "time-sensitive" analysis, it cannot be said, as defendants argue, that the government ignored, or was oblivious to, a mountain of evidence that should have been disclosed because it would have supported an alternative defense theory. At the time of the trials, there was no reason for the government to surmise the existence of a theory that Scarpa, with De-Vecchio's collusion, initiated a false war. Based on what the government knew of Scarpa and DeVecchio's relationship, even the most prudent of prosecutors would not have been on notice as to that evidence's materiality.

Had defendants articulated, at or prior to the trials, their present defense theory or made a *Roviaro* request demonstrating an interest in Scarpa as an informant, *Roviaro v. United States,* 353 U.S. 53, 60–1, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957), this materiality argument might have more force. Defendants did not do either. Thus, the *Bagley* "point of 'reasonable probability' " was over the horizon at the time of defendants' trials. Compare *United States v. Victor M. Orena,* 93 Cr. 1366 (Edward R. Korman, J.)(E.D.N.Y.), where the same materials defendants now rely on were ordered disclosed before trial because defense counsel had expressed an intention to implicate Scarpa.

The present petitioners, with good reason to believe that Scarpa was an informant, uttered not a peep about it at their trials. Their silence when Scarpa was still alive could not alert the government to the need to do what they did not themselves think necessary or desirable.

In short, defendants' argument would require of the government clairvoyant powers not at its disposal, and certainly not required by *Brady. Brady* does not impose upon the government the duty to have peered into a crystal ball and to have seen in it that which defendants now contrive to retrospectively see four years later. *See United States v. Comosona,* 848 F.2d 1110, 1115 (10th Cir.

1988) ("The government has no obligation to disclose possible theories of defense to a defendant"); *see also, United States v. Poindexter,* 727 F.Supp. 1470, 1485 (D.D.C.1989) (the government need not disclose evidence that is "not exculpatory but is merely not inculpatory and might therefore form the groundwork for some argument in favor of the defense"); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972) (the government need not comb is files to disclose evidence that is "possibly useful to the defense but not likely to have changed the verdict"); *but cf. United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976) ("the prudent prosecutor will resolve doubtful questions in favor of disclosure").

Defendants' argument as to the Ocera murder charge suffers from the same infirmity, but to an even greater degree. It relies heavily upon Scarpa's propensity to commit violent offenses and the fact that he was an informant. It does not rely upon the core of defendants' argument—the notion of a Scarpa–DeVecchio War conspiracy—because it can not. The Ocera murder occurred a full two years prior to the War. A reasonable prosecutor would have been even less likely to determine the evidence's materiality to this charge. Accepting the argument, taken to its logical conclusion, would be tantamount to holding that for every Colombo Family prosecution in which Scarpa was a possible peripheral player, including those pre-dating the War, prosecutors should have identified him as a potential suspect and disclosed everything that defendants now request. Under defendants' theory, there is no reason why every violence-prone Colombo Family informant with a tenuous connection to an offense charged would not be an eligible *Brady* fall-guy.

The fact of the matter is that there is not a sufficient reasonable and direct connection between Scarpa—the informant and inveterate violent criminal—and the Ocera murder to demonstrate that the government should have determined that the "suppressed" evidence was material to the Ocera murder charge. Defendants attempt to establish this connection by arguing that it was definitely Scarpa who stalked Montesano and Ocera shortly before Ocera's death, but that is not a fair characterization of the tenuous evidence to this effect at trial.

### c. Evidence Not Material for Purposes of Impeachment

▆▆▆ The question of whether the constellation of undisclosed facts is material for purposes of impeachment of Favo and De-Vecchio remains. Here too, however, defendants fail to surmount the materiality hurdle. Impeachment evidence is material where the witness whose credibility is at issue supplied the primary evidence linking the defendant to the crime, *United States v. Payne,* 63 F.3d 1200, 1210(citing *United States v. Petrillo,* 821 F.2d 85, 90 (2d Cir.1987)), *cert. denied,* 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996); *see also Giglio v. United States,* 405 U.S. at 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (undisclosed promises by government not to prosecute cooperating witness is material evidence where government's case depended "almost entirely" on the unindicted witness's testimony), or "where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." *Payne,* 63 F.3d at 1210. A new trial is not required when the testimony of the witness is "corroborated by other testimony," *United States v. Petrillo,* 821 F.2d 85, 89 (2d Cir.1987), or where the evidence is merely "possibly useful to the defense but not likely to have changed the verdict," *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

▆▆▆ Armed with the undisclosed evidence, defendants could have subjected Special Agent Favo, the principal law enforcement witness on the Ocera homicide in both trials, to withering cross-examination. As they have asserted, they could have challenged his credibility by raising the fact that Favo "suppressed" his concerns about De-Vecchio's handling of Scarpa. More than showing a predisposition to withhold the truth, they could have raised the specter of bias and interest. Favo, however, did not supply the primary evidence linking either defendant to the Ocera murder, and an attack on his credibility would not have under-

mined a critical element of the government's case. *See United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996).

That the jury might have found Favo untrustworthy—a far-fetched possibility in view of his reliability as a witness, as observed by the court—does not mean that the prosecution's case would have been threatened. In both trials, the government's case was supported by strong evidence apart from Favo's testimony. The testimony of witnesses Gravano, D'Arco, Bonfiglio, Maffatore, Montesano, as well as evidence from a number of tapes and items of real proof, supplied compelling evidence implicating Orena in Ocera's murder. *See supra* section II(B)(4). Tapes and testimony from Maffatore and Bonfiglio supplied overwhelming evidence implicating Amato. *See supra* section II(C)(3). Defendants' argument that Maffatore and Bonfiglio's testimony might have been infected by Favo is unpersuasive. They have not shown how an attack on Favo's credibility would have been sufficiently powerful to undermine the elements of the government's overwhelmingly strong case.

DeVecchio would have been subjected to an equally withering cross-examination at Orena's trial. (He did not testify at the trial of Amato.) Had information pertaining to DeVecchio's relationship with Scarpa been disclosed, cross examination would have taken on a different shape than it did at the trial. The bare fact that DeVecchio was Scarpa's F.B.I. handler was information that Orena could have effectively utilized and exploited to impeach DeVecchio. By eliciting that a primary source of DeVecchio's information was Scarpa, a less than reliably objective figure, Orena could have raised significant questions as to the accuracy and objectivity of the DeVecchio's account of the Colombo War. Given the duration and involvement of DeVecchio's relationship with Scarpa, Orena might have been able to impeach DeVecchio by raising the specter of interest or bias by eliciting information. DeVecchio and his testimony might well have been discredited.

DeVecchio's testimony was, however, not essential to establishment of the defendants' guilt. It was largely boilerplate, intended to provide background and history. On a number of occasions, the jury was so admonished:

Ladies and gentlemen, whether you credit his testimony is up to you. I want to warn you that much of what he is going to testify about is based on hearsay. That is, what he's learned from others. He is not a member of these organizations. He is going to describe the people he relied upon who are not available here for cross-examination and, therefore, you should scrutinize his testimony carefully, bearing in mind that the sources are not available in the main to be cross-examined ... This is just background information to help you to understand the other evidence ...

... Again, ladies and gentlemen, this is hearsay ... You'll have to depend upon proof by people who were actually observing events ...

... Now, ladies and gentlemen, although it's not contested, as I understand it that these events took place, that is no indication that they took place in connection with an alleged war or in connection with anything this defendant was associated with, or in connection with the Colombo Family ...

*Orena Trial Transcript* at 65, 88, 89. Even if DeVecchio was discredited and doubts were raised about the sloppiness of the investigation, these things would have had minimal effect on the outcome of the trial. DeVecchio's testimony was of little probative value. Evidence of the greatest probative value came from the cooperating witnesses— D'Arco, Gravano, Ambrosino, Quattrache, and Imbriale—and tapes. *See supra* sections II(B)(4)–(5).

Thus, with DeVecchio, the undisclosed evidence was not material in the sense that it could have cast doubt on the credibility of a witness who was required to supply the weight of the evidence against the defendants. *United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir.1987). Nor would the likely impact on DeVecchio's credibility "have undermined a critical element of the prosecution's case," *United States v. Payne*, 63 F.3d 1200,

1210 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996).

Finally, had defendants asked for information regarding Scarpa's relationship to De-Vecchio and Favo, these special agents would not have been called as witnesses by the government. Their testimony could have been supplied by any number of squeaky-clean F.B.I. witnesses with no connection to Scarpa.

### C. Newly Discovered Evidence Claims

■ Presenting the same arguments for relief, defendants argue that, even absent their *Brady* claim, they are entitled to a new trial based on newly discovered evidence. In making this claim, they are not limited to the information found to have been "suppressed" by the government, *see supra* section IV(B)(1), but may include information discovered after the completion of the trials. *See supra* section II(D)(5).

The addition of further evidence—the information from the Sessa, Meli and Mazza briefings, the decision of Agents Favo, Leadbetter and Tomlinson to report their suspicions of DeVecchio to Assistant Special Agent in Charge of the Criminal Division of the New York F.B.I. office North, and the subsequent Office of Professional Responsibility and Department of Justice investigations—would lend further support to defendants' theory that Scarpa and DeVecchio were in cahoots in initiating the "War." Nevertheless, to merit relief, defendants must meet the more exacting standard of a newly discovered evidence claim. *See United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 2400–01, 49 L.Ed.2d 342 (1976); *see also United States v. Wong,* 78 F.3d 73, 79 (2d Cir.1996); 3 C. Wright, Federal Practice and Procedure: Criminal 2d § 557.2 (1982).

In spite of the addition of all the "facts" developed to date, defendants do not meet the standard for a new trial based on newly discovered evidence. Defendants have failed to show that the " 'new evidence ... would probably lead to an acquittal.' " *United States v. Spencer,* 4 F.3d 115, 118 (2d Cir. 1993) (quoting *United States v. Gilbert,* 668 F.2d 94, 96 (2d Cir.1981) *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982)); *see also United States v. Siddiqi,* 959 F.2d 1167, 1173 (2d Cir.1992) (a district court should provide relief "if the defendant makes a showing that the evidence is in fact 'new,' i.e., it could not have been discovered, exercising due diligence before or during trial, and that the evidence is so material and non-cumulative that its admission 'would probably lead to an acquittal' ").

Even though the evidence is new and non-cumulative, it is not sufficient to gain relief. First, as noted at length above, the inferences that defendants would attempt to draw from the scope of evidence—augmented with evidence acquired post-trials—cannot be reasonably drawn. *See supra* section IV(B)(3)(a). Second, even if those inferences could be raised, the full panoply of undisclosed and newly discovered facts would not lead a rational jury to ignore the overwhelming, persuasive and independent evidence of defendants' guilt. In light of the record as a whole, there is no significant chance that the new facts would have raised a reasonable doubt as to defendants' guilt. *See United States v. Spencer,* 4 F.3d 115, 119 (2d Cir. 1993) (the "court must weigh whether or not there is in reality a 'significant chance' that the disclosure would have induced a reasonable doubt in the minds of enough jurors to prevent a conviction").

### 1. Ocera Murder

Orena and Amato were proven guilty of the Ocera murder by strong evidence that remains unaffected by the evidence newly discovered. There is nothing about any or all of the undisclosed and newly discovered evidence that would lead a rational person to conclude that Orena and Amato were less likely to have participated in the murder. For example, if Orena and Amato were not involved and Scarpa committed it, there is no explanation—apart from defendants specious claim of witness coaching—for the fact that Maffatore and Bonfiglio were captured on tape talking about how they wanted to get credit from Amato without ever mentioning Scarpa. Nor is there explanation for why Orena told Leale to kill Ocera, why Amato told Leale that he did not want the body found, why Ocera's gambling clubs reverted

to Leale, and why Orena and Amato stopped their usual visits to Ocera's restaurant after he was killed while Ocera was presumed by others to be merely missing. There is no explaining why Orena bragged to D'Arco that "we whacked Tommy Ocera. We gave him a *luparo bianco*." Further, Orena and Amato, not Scarpa, were implicated by the loansharking records seized from the Manor. Given this "ample, independent evidence" of their guilt, it is highly unlikely that Orena and Amato's strong motive for slaying Ocera could exist and that, out of sheer coincidence or serendipity, Scarpa decided to kill Ocera for his own unfathomable reasons at that very time. *See United States v. Gilbert,* 668 F.2d 94, 96 (2d Cir.1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982).

### 2. War Conspiracy

Similarly, the evidence does not shake confidence in the verdict on Orena's War count. Contrary to Orena's argument that the evidence supports the theory that his actions in what was a Scarpa–DeVecchio War were defensive, there is "ample, independent evidence" that the War did in fact exist and that Orena actively induced and prosecuted it. *See United States v. Gilbert,* 668 F.2d 94, 96 (2d Cir.1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982). To find for Orena would be, among other things, to ignore the substantial testimony of Gravano, D'Arco and Ambrosino. Their testimony at trial established that Orena began a campaign to wrest control of the Colombo Family shortly after he was appointed Acting Boss in 1988, and that he set out to do so by at first disparaging Persico, and then later attempting to kill Persico loyalists, beginning with Sessa. The evidence established that Orena asked D'Arco to kill Scarpa in 1990, and then later that year made the same request of Gravano and D'Arco. During the period when the three-family committee imposed a no-shooting rule on the Colombo feuding factions, Orena told D'Arco and others that he wanted to start shooting. None of this evidence would have been affected by the "new" evidence or the theory Orena attempts to build from it.

Orena's argument that Scarpa planted the loaded firearms and extra ammunition found in a bag under the Valley Stream residence's deck is spurious and similarly ignores devastating evidence adduced at trial. Orena made essentially the same argument at trial, and the jury rejected it. That Scarpa was an informant and received information from DeVecchio does not make this theory significantly more plausible. Even if it did, there was still powerful evidence recovered from inside the house inculpating Orena. At trial it was shown that there were fully-loaded shotguns seized from each of the three closets in the basement. One, a twenty gauge pump Mossberg, was equipped with a pistol grip for ease of concealment. Lethal hollow-point bullets, shotgun shells, 9–millimeter clips, an ammunition belt holding shotgun shells, bullet-proof vests, mobile phones and beepers were also recovered from inside the house.

Moreover, Orena's "defensive" argument defies other facts adduced at trial. His argument cannot explain why individuals on both the Persico and the Orena side had bullet proof vests. Nor does it deal with why two separate Orena faction teams had hit lists of Persico factionalists, none of whom was Scarpa. When viewed in the broader context that incorporates his possession of a personal munitions arsenal, Orena's argument that he possessed the Coles Directories, toll records and lists in order to stay one step ahead of whoever—i.e., Scarpa, the agent provocateur—was trying to track him down overly strains credulity. Defendants' theory conveniently ignores the fact that the seized telephone records focused on two of the three captains who had refused to come into Orena's faction after the June 1991 attempt on his life, Joseph Russo and Teddy Persico. It conveniently blinks at Ambrosino's testimony that Orena had announced that those who did not come in, like Russo, would be targeted.

Given the strength and weight of the evidence of Orena's guilt introduced at trial, the undisclosed and newly discovered evidence is not "of a sort that could, if believed, change the verdict." *United States v. Gambino,* 59 F.3d 353, 364 (2d Cir.1995), *cert. denied,* —

U.S. ——, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996).

### 3. Claims Unrelated to Scarpa–DeVecchio Material

 Orena raises a number of ancillary claims apart from the Scarpa–DeVecchio issue in an effort to chip away at the overwhelming evidence of guilt. One of them is Orena's argument that Gravano's testimony in another case, *United States v. Stancell*, 95 CR 503 (N.D.Ga.1996), constitutes newly discovered evidence that contradicts his and D'Arco's testimony, as well as the government's argument, at the Orena trial that Orena's primary motive to kill Ocera was to please Gotti by retaliating for Ocera's murder of Greg Reiter.

In *Stancell*, the evidence established that Gambino associate Mark Reiter hired fellow inmates, Stancell and another, to murder a third inmate, William Bright, who Reiter believed responsible for murdering his son, Greg. Bright was murdered on May 24, 1994. During the *Stancell* proceedings and outside of the jury's presence, Gravano testified that the Ocera homicide had no connection to Greg Reiter's disappearance and murder. He testified that Gotti was angry because a woman had told him that Ocera was bad-mouthing him, and that an internal mob investigation into the murder never raised Ocera's name. Orena then points to another case, *United States v. Brennan*, 95 CR 941 (Frederic Block, J.)(E.D.N.Y.), in which the government charged that defendant Robert Scott Brennan murdered Dennis Harrigan in retaliation for Harrigan's murder of Greg Reiter. Harrigan was murdered on October 1, 1991.

Thus, Orena now argues that the facts of *Brennan* and Gravano's *Stancell* testimony contradict the government's theory of motive for the Ocera murder case against Orena. If the elder Reiter believed, so the argument goes, that Harrigan and Bright were responsible for Greg's murder, then it makes no sense at all that Gotti believed that Ocera was responsible and communicated that to Orena. Further, Gravano's testimony in *Stancell* indicates that a different motive existed. This argument misses the mark.

First, it should be noted that the primary motive for the Ocera murder the government advanced at trial was Orena's concern that Ocera allowed his loanshark records to fall into the possession of law enforcement. *See supra* section II(B)(4). Orena's desire to ingratiate himself with Gotti was a subsidiary motive, not the principal one, as Orena now argues. Second, Gravano's testimony in connection with *Stancell* does not contradict his or D'Arco's testimony in Orena's trial or the government's theory. Orena ignores the significance of timing in the Harrigan and Bright murders—two years and five years, respectively, after the Ocera murder. Shortly after Greg Reiter's murder in October 1989, Gotti and Orena may well have blamed Ocera, only to learn later—prior to October 1, 1991—that Ocera was not responsible. At Orena's trial, the government never argued that Ocera murdered Greg Reiter; the critical thing that was argued was that Orena ordered Ocera's murder to curry favor with Gotti, and that it was believed to be for the purpose of retaliating for Greg Reiter's death.

Orena fails to show that this newly discovered evidence is material. *United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir.1992). The effect of Gravano's testimony when considered in the context of the whole record—i.e., combined with the effect of the Scarpa–DeVecchio material—would not "probably lead to acquittal." *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir.1993).

Second, Orena argues that since the completion of the trials, new evidence has emerged that bears upon the credibility of both Gravano and D'Arco. In the case of Gravano, Orena asserts that there is new evidence to show that Gravano was involved in drug trafficking and two murders in the 1970's. At Orena's trial, Gravano did not testify as to his involvement in these alleged offenses. Thus, Orena asserts that Gravano lied about the full extent of his prior criminal conduct, and that he should be granted a new trial in light of the fact that Gravano's testimony was critical to the government's case in chief.

■ Even if it was true that Gravano committed these alleged offenses—Gravano has not admitted to participation in the two murders, and Orena bases his assertion on two newspaper articles, see Greg B. Smith, *Gotti Tries to Rope Bull,* New York Daily News, January 4, 1996; Greg B. Smith, *2 Can Link Giavano to Slays,* New York Daily News, January 5, 1996, at 5—the information constitutes cumulative impeachment evidence at best, and is the evidentiary equivalent of a grain of sand on Jones Beach. At Orena's trial, Gravano was cross-examined interminably regarding his criminal past, including his involvement in 19 murders, among other offenses. The addition of a few more killings would not have materially affected the defense's cross examination. A new trial is not merited where the new impeachment evidence is cumulative of evidence already introduced. *United States v. Gordils,* 982 F.2d 64, 72 (2d Cir.1992), *cert. denied,* 507 U.S. 1054, 113 S.Ct. 1953, 123 L.Ed.2d 657 (1993); *United States v. Orena,* 32 F.3d 704, 717 (2d Cir.1994) (evidence of drug activity by Gravano would not undermine his credibility, especially in light of his extensive history of criminal activity); *United States v. Locascio,* 6 F.3d 924, 949 (2d Cir.1993) (evidence suggesting that Gravano participated in two additional murders was cumulative impeachment evidence not warranting new trial where jury heard evidence of his participation in 19 murders), *cert. denied,* 511 U.S. 1070, 114 S.Ct. 1646, 128 L.Ed.2d 365 (1994); *see also, United States v. Gambino,* 59 F.3d 353, 365 (2d Cir.1995) ("we are unpersuaded that any perjury occurred. Gravano had stated under oath in those earlier trials of Gambino organization members that he and the Gambino organization had a principle of not dealing in drugs. Yet, that policy statement is not flatly inconsistent with his having become involved on his own ... It is at most evidence that Gravano did not adhere to the rules of the organization of which he was a high-ranking member"), *cert. denied,* —— U.S. ——, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996).

■ As to D'Arco, Orena asserts that new evidence shows that he too did not testify candidly at trial about his involvement in narcotics dealing. Through his testimony, D'Arco gave the impression that he did not extensively engage in trafficking and that he ceased such involvement in the early 80's. Orena argues that the newly discovered evidence suggests that D'Arco was involved in narcotics trafficking as late as 1989. D'Arco and others were named as targets of electronic surveillance by the Manhattan District Attorney's Office on probable cause to believe that they were engaged in ongoing drug dealing in the vicinity of D'Arco's restaurant in lower Manhattan.

Orena unpersuasively argues that because D'Arco's testimony was important in establishing Orena's role in the Ocera murder—D'Arco testified that Orena took credit for killing Ocera—this impeaching evidence is sufficiently material to warrant a new trial. First, D'Arco was only one of several important government witnesses on the Ocera murder charge. D'Arco was corroborated independently by Maffatore, Bonfiglio, the Bonfiglio tape, Gravano, and Montesano. *See United States v. Wong,* 78 F.3d 73, 79 (2d Cir.1996) (impeachment evidence may be material where witness supplied the only evidence linking the defendant to the crime or where likely impact on credibility would have undermined a critical element of prosecution's case).

Second, as with the newly discovered evidence relating to Gravano, this evidence is merely cumulative impeachment evidence. D'Arco admitted at trial that he was involved in a lifetime of crime, including murders, conspiracies to murder, assaults, loansharking, heroin dealing, tax fraud, labor racketeering, arson, counterfeiting, firearms offenses and hijacking. The addition of evidence suggesting D'Arco's participating in narcotics trafficking in 1989, contrary to the implications of his earlier testimony, would not have further appreciably impugned D'Arco's veracity, leading to an acquittal. *See United States v. Orena,* 32 F.3d 704, 717 (2d Cir.1994); *United States v. Locascio,* 6 F.3d 924, 949 (2d Cir.1993), *cert. denied,* 511 U.S. 1070, 114 S.Ct. 1646, 128 L.Ed.2d 365 (1994); *United States v. Gordils,* 982 F.2d 64, 72 (2d Cir.1992), *cert. denied,* 507 U.S. 1054, 113 S.Ct. 1953, 123 L.Ed.2d 657 (1993).

## V CONCLUSION

There are cases such as *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), where *Brady* violations and "suppression" of evidence favorable to the accused prevent a fair trial or lead to doubts about guilt. The instant case is not one of them. There was no miscarriage of justice here. The proper defendants were convicted by overwhelming evidence in fair trials. Nothing discovered since throws doubt upon this conclusion.

The troubling DeVecchio–Scarpa relationship is anomalous but not unique. Scarpa remained a feral killer who gave up some valuable information to the F.B.I. without abandoning his independent criminal status or life. DeVecchio provided protection and limited information in order to gain continuing intelligence on the workings of a dangerous criminal enterprise. Pride in having achieved this connection, poor supervision, and a genuine affection between the killer and his "handler," resulted in the link continuing longer than it should have. Nevertheless, the DeVecchio–Scarpa connection had no discernable effect on the criminal activities of the defendants Orena and Amato or on their trials. Each defendant was driven by the strange calculus of the criminal mobster's mind and environment, not by the F.B.I., and not by Special Agent R. Lindley DeVecchio.

The petitions are dismissed. The motions are denied.

SO ORDERED.